**In the United States District Court for
the Southern District of New York**

| | |
|---|---|
| **Shawyne Harris**, **Robert Taylor**, and **Sidney Dasent**, individually and as representatives of a class similarly situated persons, on behalf of the **Swiss Re Group U.S. Employee's Savings Investment Plan**, | |
| *Plaintiffs,* | Case No. _____ |
| | The Honorable Judge _____ |
| v. | **Class Action Complaint** |
| **Swiss Re American Holding Corporation**, the **Board of Directors of the Swiss Re American Holding Corporation**, the **Swiss Re American Holding Corporation Governance & Nomination Committee, the Swiss Re American Holding Corporation Audit Committee, the Swiss Re American Holding Corporation Compensation Committee, the Swiss Re American Holding Corporation Finance & Risk Committee, the Swiss Re American Holding Corporation Investment Committee**, and **Does No. 1-30**, whose names are currently unknown, | **Jury Trial Demanded** |
| *Defendants.* | |

## INTRODUCTION

1.     Plaintiffs, Shawyne Harris ("Harris"), Robert Taylor ("Taylor"), and Sidney Dasent ("Dasent") (collectively, "Plaintiffs"), individually in their capacity as former participants of the Swiss Re Group US Employees' Savings Plan ("Plan"), bring this action under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants, against Defendants, Swiss Re American Holding

Corporation ("Swiss Re"), the Board of Directors of Swiss Re Corporation ("Board"), the Swiss Re Governance and Nomination Committee ("Governance and Nomination Committee"), the Swiss Re Audit Committee ("Audit Committee"), the Swiss Re Compensation Committee ("Compensation Committee"), the Swiss Re Finance & Risk Committee ("Finance & Risk Committee"), the Swiss Re Investment Committee ("Investment Committee") (collectively, "Committees") and Does No. 1-30, who are members of the Committees or other fiduciaries of the Plan and whose names are currently unknown (collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., and related breaches of applicable law beginning six years prior to the date this action is filed and continuing to the date of judgment or such earlier date that the Court determines is appropriate and just (the "Class Period").

2.     Defined contribution plans (e.g., 401(k) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's de facto retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment and underperformance.

3.     The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.     As of August 6, 2021, the Plan had more than four thousand participants with account balances and assets totaling approximately $1.38 billion,

placing it in the top 0.1% of all defined contribution plans by plan size.[1] Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services fees within the marketplace for administration of defined contribution plans and the investment of defined contribution assets. The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.     Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services. Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable.

6.     Defendants have breached their fiduciary duties to the Plan. As detailed below, Defendants: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants and beneficiaries; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time Defendants selected and retained the funds at issue and throughout the Class Period.

7.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29

---

[1] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under all of the circumstances.

8.     Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

        a.    A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law.

        b.    A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants.

        c.    Equitable, legal or remedial relief for all losses and/or compensatory damages.

        d.    Attorneys' fees. Costs and other recoverable expenses of litigation.

        e.    Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## THE PARTIES

9.     Harris is a former employee of Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a resident of Highland Mills, NY. During the Class Period, Harris maintained an investment through the Plan and was subject to the excessive recordkeeping and administrative costs alleged below.

10.     Taylor is a former employee of Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a resident of Poughkeepsie, NY. During the Class Period, Taylor maintained an investment through the Plan and was subject to the excessive recordkeeping and administrative costs alleged below.

11.     Dasent is a former employee of Swiss Re and former participant in the Plan under 29 U.S.C. § 1002(7) and is a resident of Cambria Heights, NY. During the Class Period, Dasent maintained an investment through the Plan in the and was subject to the excessive recordkeeping and administrative costs alleged below.

12.     Swiss Re is a foreign business corporation headquartered in Zurich, Switzerland with an office located at 1301 Avenue of the Americas, New York, New York 10019. Swiss Re describes itself as "one of the world's leading providers of reinsurance, insurance, and other forms of insurance-based risk transfer, working to make the world more resilient. The aim of the Swiss Re Group is to enable society to thrive and progress, creating new opportunities and solutions for its clients."

13.     Upon information and belief, the Board consists of ten individuals. According to Swiss Re's 2020 Form 5500, the Plan is administered and controlled by the Board of Swiss Re and they are fiduciaries under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.

14.     The Board appointed "authorized representatives" including the Committees, as plan fiduciaries. Does No. 1-10 are members of the Board who were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committees, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

15.     Swiss Re's 2020 Form 5500 mentions that an Employee Pension Plan Committee exists which "determines the Plan's valuation policies utilizing information provided by the investment advisors and custodian," making them a fiduciary under ERISA pursuant to 29 U.S.C. § 1002(21)(A).

16.     As of the date of this filing, according to Swiss Re, on its "About Us" page, it provides that the Governance and Nomination Committee is established by Swiss Re to "support Swiss Re's Board of Directors with the succession planning at

both Board and Group Executive Committee level and addresses Corporate Governance and ESG topics" and is in charge of "nominating members of the Board of Directors and of the Group Executive Committee and is responsible for the succession planning for the Group CEO." The Committee "supports the Board of Directors in its overall responsibility to propose Board and Compensation Committee members for election or re-election by the shareholders at the AGM and to appoint both Group Executive Committee members and the Group CEO" and "oversees Swiss Re's talent management and respective initiatives as well as its annual performance assessment and self-assessment at Board and Group Executive Committee levels, including for the Group CEO."

17.    Similarly, Swiss Re states that the Audit Committee "assists the Board of Directors in fulfilling its oversight responsibilities related to the integrity of Swiss Re's financial statements, compliance with legal and regulatory requirements, the external auditor's qualifications, independence and performance as well as the performance of Group Internal Audit" and "independently and objectively monitors Swiss Re's financial reporting process and system of internal control, and it facilitates ongoing communication between the external auditor, the Group Executive Committee, the Business Units, Division iptiQ, Group Internal Audit and the Board with regard to Swiss Re's financial reporting and, more broadly, its financial situation."

18.    Further, the Compensation Committee "supports the Board of Directors in establishing and reviewing Swiss Re's compensation framework and guidelines and performance criteria as well as in preparing the proposals to the AGM regarding the compensation of the Board of Directors and of the Group Executive Committee" and "proposes compensation principles for the Swiss Re Group in line with legal and regulatory requirements and the Articles of Association to the Board of Directors for approval. It determines within those approved

principles, the establishment of new (and amendments to existing) compensation plans, and determines, or proposes, as appropriate, individual compensation." It "ensures that compensation plans do not encourage inappropriate risk-taking within the Swiss Re Group and that all aspects of compensation are fully compliant with applicable laws, rules and regulations as well as the Articles of Association."

19.     Also, the Finance and Risk Committee "annually reviews the Group Risk Policy and proposes it for approval to the Board of Directors" and "reviews the Group's Risk Control Framework and the most important risk exposures in all major risk categories, as well as new products or strategic expansions of Swiss Re's areas of business and the risk aspect of control transactions that cover the acquisition of equity ownership in legal entities for strategic purposes." The Finance and Risk Committee "reviews critical principles used in internal risk measurement, valuation of assets and liabilities, capital adequacy assessment and economic performance management."

20.     The Investment Committee is established by Swiss Re to assist it with the selection of investment funds offered for selection by Plan participants and is a fiduciary under ERISA pursuant to 29 U.S.C. § 1002(21)(A). The Investment Committee "endorses the strategic asset allocation and reviews tactical asset allocation decisions" and "reviews the performance of the financial assets of Swiss Re and endorses or receives information on participants and principal investments." The Committee "reviews the risk analysis methodology as well as the valuation methodology related to each asset class and ensures that the relevant management processes and controlling mechanisms in Asset Management are in place."

## JURISDICTION AND VENUE

21.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

22.     This Court has subject matter jurisdiction over this action pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e), and 28 U.S.C. § 1391 because Swiss Re resides in this district as defined by 28 U.S.C. § 1391.

23.     Plaintiffs have standing to bring this action. Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court. In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive recordkeeping and administrative fees and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## FACTUAL ALLEGATIONS

### 1.     Background and Plan Structure

24.     The Plan is a defined contribution plan that is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan is administered and controlled by the Board of Directors of Swiss Re America Holding Corporation ("Plan Administrator"). Great-West Trust Company LLC serves as the Plan's trustee (the "Trustee"). Great-West Financial Retirement Plan Services, LLC provides recordkeeping and other services to the Plan.

25.     Each participant's account is credited with the participant contributions, employer matching contributions, allocated forfeitures when applicable, and earnings or losses thereon. Participant accounts are charged with an allocation of administrative expenses. The Plan credits all revenue sharing received by the Plan to the accounts of those participants who had a balance in the fund that paid the revenue sharing amount. Allocations are based on participant earnings or balances. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account balance. The available investment options for participants of the Plan include mutual funds, common collective trust funds, a stable value investment option and self-directed brokerage accounts.

26.     Great West Life & Annuity Insurance Company ("Great West") has served as the Plan's recordkeeper for at least the past six years. As the recordkeeper, Great West is responsible for maintaining records with respect to employees' accounts in the Plan, effectuating participant Plan investment elections, and performing administrative functions such as processing loans and withdrawal requests.

27.     An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. §1104(a)(1). These duties require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries." *Id.*

28.     The Plan Administrator breached its fiduciary duty of prudence and loyalty and mismanaged the Plan by paying excessive recordkeeping fees to the Plan's recordkeeper, Great West. This breach cost the Plan millions of dollars over the course of the relevant time period.

2.      **The Defined Contribution Industry**

29.     Failures by ERISA fiduciaries to monitor fees and costs for
reasonableness, such as those identified herein, have stark financial consequences
for retirees. Every extra level of expenses imposed upon plan participants
compounds over time and reduces the value of participants' investments available
upon retirement. Over time, even small differences in fees compound and can result
in vast differences in the amount of a participant's savings available at retirement.
As the Supreme Court stated, "[e]xpenses, such as management or administrative
fees, can sometimes significantly reduce the value of an account in a defined-
contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

30.     The impact of excessive fees on a plan's employees' and retirees'
retirement assets is dramatic. The U.S. Department of Labor ("DOL") has noted
that a 1% higher level of fees over a 35-year period makes a 28% difference in
retirement assets at the end of a participant's career.[2]

31.     Plan participants typically have little appreciation of the fees being
assessed to their accounts. Indeed, according to a 2017 survey conducted by TD
Ameritrade, only 27% of investors believed they knew how much they were paying
in fees as participants in defined contribution plans, and 37% were unaware that
they paid defined contribution fees at all.[3] It is incumbent upon plan fiduciaries to
act for the exclusive best interest of plan participants. This includes protecting the
participants' retirement dollars and ensuring that fees are fully disclosed and
remain reasonable for the services provided. Fiduciaries of defined contribution
retirement plans, including large retirement plans like the Plan, also often lack

---

[2] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019),
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (accessed August 17, 2022).
[3] *See* https://s2.q4cdn.com/437609071/files/doc_news/research/2018/Investor-Sentiment-Infographic-401k-fees.pdf (accessed August 17, 2022).

understanding of the fees being charged to the plans that they administer, manage and control in derogation of their fiduciary duties.

**3.      Recordkeeping and Administrative Services**

32.      Most fiduciaries of large defined contribution plans, including the Plan, hire a single provider to provide the essential recordkeeping and administrative ("RK&A") services for the plan. These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services.

33.      The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper" – that is recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

34.      Recordkeepers typically collect their fees in two forms, respectively referred to as "direct" compensation and "indirect" compensation.

35.      Direct compensation is paid directly from plan assets and reflected as a deduction in the value of participant accounts.

36.      Indirect Compensation is paid to the recordkeeper indirectly through investment options prior to the value of the investment option being provided to the participant (most often from the investment's expense ratio in the form of so-called "revenue sharing" payments that are collected by the investment provider and then remitted to the recordkeeper). Thus, in most cases, participants are not aware that they are paying these fees.

37.      Virtually all recordkeepers are subsidiaries or affiliates of financial services and insurance companies that also provide investment options to defined

contribution plans (e.g., mutual funds, insurance products, collective trusts, separate accounts, etc.), or have some other ancillary line of business (e.g., consulting) to sell to plans. Discounts in the RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (e.g., investment management revenues). In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

38.     For medium plans with greater than 4,000 participants, any minor variations in the way that these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services. This fact is confirmed by the practice of recordkeepers quoting fees for the Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested. These individual differences are treated as immaterial because they are inconsequential to recordkeepers from a cost perspective.

39.     Due to these economies of scale that are part of a recordkeeping relationship, and because the incremental variable costs for providing RK&A are dependent on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases and, as a result, a recordkeeper is willing to accept a lower fee to provide RK&A as the number of participants in the plan increases.

40.     As a result, it is axiomatic in the retirement plan services industry that an Employer Sponsor of a Retirement Plan applying a viable methodology to (1) a plan with more participants will negotiate a lower effective per-participant fee when evaluated on a per-participant basis; and (2) that as participant counts and

plan assets under management increase, the effective per-participant RK&A fee should decrease.

41.     The average cost to a recordkeeper of providing services to a participant similarly does not hinge on that participant's account balance. In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a balance of $1,000,000.

42.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics. Understanding these marketplace realities and facts, prudent fiduciaries of large plans (like the Plan) will leverage the plan's participant count to obtain lower effective per-participant fees.

43.     Because recordkeeping fees are actually paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis. This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

44.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider. Recognizing that RK&A services are essentially uniform in nature, and that any minor differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote. These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

**4.       Defendants' Breaches of their Fiduciary Duties**

45.       Defendants breached their fiduciary duties of prudence and/or loyalty
to the Plan in several significant ways which taken in the aggregate result in
egregious behavior.

*4.1     The Plan's Excessive Recordkeeping and Administrative Costs*

46.       Defendants' breached their fiduciary duties by allowing the Plan to pay
excessive RK&A fees. The impact of such high fees on participant balances is
aggravated by the effects of compounding, to the significant detriment of
participants over time. This effect is illustrated by the below chart, published by the
SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points
(0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



47.       During the Class Period, participants paid Great West for RK&A
services through direct charges to their accounts and indirectly through asset-based
revenue sharing. The RK&A services provided to the Plan and were the same
standard services identified above, and those provided to comparable plans. There
are no services provided to the Plan and its participants by Great West that are
unusual or out of the ordinary. For large plans like the Plan, any differences in

services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether the plan fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

48.    According to the "Study of 401(K) Plan Fees and Expenses" submitted by the Pension and Welfare Benefits Administration to the Department of Labor on April 13, 1998, Table IV-4 on p.48 shows the estimated average recordkeeping expenses by the number of plan participants:

**Table IV-4**
**Average 401(k) Plan Recordkeeping Fees, 1995**
By Number of Plan Participants

| Number of Participants | Costs Per Participant |
| --- | --- |
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

49.    The NEPC is one of the largest consultants to the Financial Services Industry. Each year they publish a "Defined Contribution Plan Trends and Fee Survey." According to their 2021 survey, in their "Recordkeeping, Trust, Custody Fee Review, Benchmarking Base Fees" section, the median cost was about $63 per participant for a plan with 1,000-5,000 participants based on 137 defined contribution and deferred compensation plans. As the Plan fits within this participant amount, $63 can be used as to evaluate whether the amount paid by Plaintiffs in recordkeeping fees was excessive.

50.    Since the start of the Class Period, Defendants allowed the Plan to be charged total amounts of RK&A fees that far exceeded the reasonable market rate.

51.    A review of the Form 5500s filed on behalf of the Plan illustrates damages of more than four million dollars ($4,000,000) from excessive recordkeeping fees alone.

52.     Swiss Re permitted its participants to pay nearly 400% more than their counterparts in similarly sized plans in 2020.

53.     Rather than agree to a $34 - $63 per participant charge, Swiss Re, instead, allowed participants to pay fees of approximately $163 to $282 in the same time period resulting in the below approximate calculated damages:

| Year | Direct Comp. Per Participant | Year-End Participants | Direct Comp. Per Participant, Less $34 | Damages, Less $34 Per Participant | Direct Comp. Per Participant, Less $63 | Damages, Less $63 Per Participant |
|---|---|---|---|---|---|---|
| 2020 | $242.92 | 4060 | $208.92 | $848,215.00 | $179.92 | $730,475.00 |
| 2019 | $282.43 | 4042 | $248.43 | $1,004,154.00 | $217.43 | $878,852.00 |
| 2018 | $170.54 | 3990 | $141.54 | $564,745.00 | $107.54 | $429,085.00 |
| 2017 | $163.64 | 3895 | $129.64 | $504,948.00 | $100.64 | $391,993.00 |
| 2016 | $184.64 | 4087 | $150.64 | $615,666.00 | $121.64 | $497,143.00 |
| 2015 | $216.46 | 4135 | $182.46 | $754,472.00 | $153.46 | $634,667.00 |
| Direct Fee Damages: | | | | $4,292,200.00 | | $3,562,215.00 |

54.     An alternative method of approximately quantifying RK&A expenses is by utilizing Part II, Income and Expense Statement, the Expenses Section, line i (5) of the 5500s:

| Year | Admin. Expense (Line i(5)) Per Participant | Year-End Participants | Admin. Expense, Less $34 Per Participant | Damages, Less $34 Per Participant | Admin. Expenses, Less $63 Per Participant | Damages, Less $63 Per Participant |
|---|---|---|---|---|---|---|
| 2020 | $249.07 | 4060 | $215.07 | $873,184.00 | $186.07 | $755,444.00 |
| 2019 | $283.57 | 4042 | $249.57 | $1,008,762.00 | $220.57 | $891,544.00 |
| 2018 | $282.94 | 3990 | $248.94 | $993,271.00 | $219.94 | $877,561.00 |
| 2017 | $243.25 | 3895 | $209.25 | $815,029.00 | $180.25 | $702,074.00 |
| 2016 | $259.78 | 4087 | $225.78 | $922,763.00 | $196.78 | $804,240.00 |
| 2015 | $254.65 | 4135 | $220.65 | $912,388.00 | $191.65 | $792,473.00 |
| Direct Fee Damages: | | | | $5,525,397.00 | | $4,823,336.00 |

55.     The Plan participants overpaid recordkeeping fees to Great West which resulted in a substantial loss to the Plan and to each participant's account balance.

56.     Given the Plan's size and resulting negotiating power, with prudent management and administration, the Plan failed to obtain reasonable rates for

16

RK&A services that were significantly lower than the effective per-participant RK&A rates set forth above.

57.    Accordingly, using publicly available data and information from the Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period. That is clear evidence that the reasonable market rate is lower than the Plan's rate, as comparable plans were able to negotiate lower fees for materially identical services.

58.    Defendants' failure to recognize that the Plan and its participants were grossly overcharged for RK&A services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for RK&A services. Had Defendants appropriately monitored the compensation paid to Great West and ensured that participants were only charged reasonable RK&A fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

*4.2    The Plan's Imprudent Investment Options*

59.    Several of the Plan's investment options are objectively imprudent.

### 4.2.1. 401(k) Expense Ratio Averages

60.    The Investment Company Institute (ICI) and Brightscope produce 401(k) plan-level data from audited 5500 filings. The data helps retirement plan sponsors understand the expense ratio information that matches the characteristics of their plan. The latest expense ratio data was produced in July 2021 for 401(k) plans as of 2018. Swiss Re's Plan assets have been greater than a billion dollars since 2018. The following is the 10th percentile, median, and 90th percentile asset-weighted mutual fund expense ratios as a percentage of plan assets among plans

17

with audited 401(k) filings in the BrightScope database by mutual fund investment objective and plan assets.

| Name of Fund Greater Than $1 Billion | E/R a/o 4Q 2018/ 5/2022 | Category | 10th Percentile Medium E/R Greater Than $1 Billion | Medium Percentile Medium E/R Greater Than $1 Billion | 90th Percentile Medium E/R Greater Than $1 Billion |
|---|---|---|---|---|---|
| JPM SmtRet Inc R5 | .55%/.49% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2020 R5 | .57%/.50% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2025 R5 | .58%/.51% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2030 R5 | .59%/.51% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2035 R5 | .60%/.54% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2040 R5 | .61%/.55% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2045 R5 | .61%/.55% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2050 R5 | .62%/.55% | TD | 0.09% | 0.40% | 0.70% |
| JPM SmtRet 2055 R5 | .63%/.55% | TD | 0.09% | 0.40% | 0.70% |
| Am GroAm R6 | 0.33% | Dom. Equity | 0.02% | 0.31% | 0.81% |
| Dodge & Cox Fd | 0.52% | Dom. Equity | 0.02% | 0.31% | 0.81% |
| Am EuroGro R6 | 0.49% | Int'l Equity | 0.06% | 0.49% | 0.85% |
| Pim Tot Ret Inst | 0.55% | Dom. Bonds | 0.03% | 0.37% | 0.61% |

**Total AUM in Swiss Re's Defined Contribution Plan with regards to the above referenced investments per their respective 5500s (in millions):**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| TDFs | 115.19 | 130.70 | 168.98 | 164.81 | 210.92 | 248.05 |
| 4 Fds | 312.27 | 329.01 | 393.28 | 344.96 | 401.53 | 442.10 |
| TOTAL | 427.46 | 459.71 | 562.26 | 509.77 | 612.45 | 690.15 |

61.     Swiss Re chose 12 investments at or well over the medium percentile, medium expense ratio, as of 2018, for defined contribution plans that had more than 1 billion dollars in assets. Throughout these years, this represented more than 50% of all the assets in the Retirement Plan.

### 4.2.2. Share Class Expense Ratios

62.     November 3, 2014 was the earliest available date that assets could have been invested in JPM's Smart Retirement Target Date Class R6 funds, which

had/has a lower expense ratio then their R5 counterparts. Nevertheless, Swiss Re chose to expose their retirement plan participants to the R5 shares (in millions).

|         | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
|---------|---------|---------|---------|---------|---------|---------|
| **R5 TDFs** | 115.19 | 130.70 | 168.98 | 164.81 | 210.92 | 248.05 |

63.    Though the expense ratio difference between the R5s and R6s in the earlier years was greater, over the last few years the difference was approximately 0.10%, reducing the yearly compounding returns that retirement plan participants would have received. If this is quantified on a simple yearly basis, the following loses materialize:

|                        | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **Total Estimated Loss** |
|------------------------|---------|---------|---------|---------|---------|---------|--------------------------|
| **Estimated Sh. Cl. Loss** | 115,190 | 130,790 | 168,980 | 164,810 | 210,920 | 248,050 | **1,038,740** |

64.    With regard to the Target Date Fund series that they chose, Swiss Re did not choose the share class with the lowest expense ratio that was available to them. This caused a relative loss of returns to the participants.

65.    A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. TDFs offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation.

66.    Defendants were responsible for selecting the Plan lineup and could have chosen better after-cost performing TDF families but elected to retain the JP Morgan ("JPM") Smart Retirement TDFs in the R5 Share Class. This imprudent decision, an outcome of poor methodology, has cost Plan participants significant growth in their retirement assets. Given the size of the Retirement Plan, the amount of assets dedicated to the Target Date Funds, and the high average balance per participant, Swiss Re easily qualified for the share class with the lowest

expense ratio (R6) which would have resulted in the participants receiving a higher compounding return. Yet they chose the R5 share class, a share class with a higher expense ratio which reduces the compounding returns that participants enjoy.

67.     However, even if Swiss Re gave some consideration to the JPM SmartRetirement R6 TDFs, any objective and viable evaluation would have recognized more consistent and better performing TDFs, given the relative superiority of alternative TDF suites. In creating and retaining the JPM TDFs, Defendants clearly failed to carry out their responsibilities to focus solely on the interests of the participants. Had Defendants acted in the sole interest of Plan participants by, for example, simply weighing the benefits of the JPM TDFs against readily available alternative TDFs, Defendants would have concluded that the JPM TDFs represented a clearly inferior option and were therefore an inappropriate offering in the Plan lineup.

### 4.2.3. Performance Rankings

68.     When fiduciaries and their advisors make investment option and review decisions, gauging performance relative to category rankings is very important because it helps them gain perspective on how well an investment performs relative to others in its peer group. For example, Quartile Rank is a measure of how well a mutual fund/investment has performed against all others in its category. This information is offered through Morningstar, a readily available resource.

# Target Date Funds

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2020 R5 | -0.76% | 5.85% | 13.96% | -5.35% | 15.83% | 10.31% | 6.08% | -0.54 | 6% | 5.83% |
| Cat: TD 2020 | -1.57% | 6.23% | 12.46% | -4.49% | 16.14 | 10.79% | 8.45% | 1.47% | 7.47% | 6.79% |
| Ind: Morn LiMod 2020 | -1.88% | 7.66% | 12.79% | -4.16% | 17.73 | 13.32% | 9.04% | 2.69% | 8.26% | 7.48% |
| Quart Rank | 1st | 3rd | 1st | 4th | 3rd | 3rd | 4th | 4th | 4th | 4th |
| Percentil Rank | 24th | 66th | 19th | 81st | 61st | 68th | 90th | 95% | 87th | 86th |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2025 R5 | -0.94% | 6.11% | 16.32% | -6.58% | 18.48% | 11.84% | 8.57% | -0.36% | 7.48% | 6.98% |
| Cat: TD 2025 | -1.59% | 6.73% | 14.67% | -5.34% | 18.25% | 11.84% | 9.75% | 1.90% | 8.26% | 7.48% |
| Ind: Morn LiMod 2025 | -2.06% | 8.39% | 14.54% | -4.90% | 19.36% | 13.67% | 10.10% | 2.92% | 8.85% | 8.06% |
| Quart Rank | 2nd | 4th | 1st | 4th | 3rd | 3rd | 4th | 4th | 4th | 4th |
| Percentile Rank | 27th | 78th | 13th | 91st | 52nd | 64th | 81st | 95th | 77th | 78th |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2030 R5 | -1.31% | 6.15% | 18.88% | -7.54% | 20.71% | 12.62% | 10.77% | 1.31% | 8.65% | 8.03% |
| Cat: TD 2030 | -1.79% | 7.33% | 16.57% | -6.25% | 20.07% | 12.99% | 11.68% | 2.61% | 9.46% | 8.48% |
| Ind: Morn LiMod 2030 | -2.30% | 9.26% | 16.59% | -5.82% | 21.24% | 13.69% | 11.69% | 3.33% | 9.60% | 8.76% |
| Quart Rank | 2nd | 4th | 1st | 4th | 2nd | 3rd | 4th | 4th | 4th | 3rd |
| Percentile Rank | 40th | 81st | 7th | 92nd | 44th | 65th | 81st | 87th | 76th | 72nd |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet2035 R5 | -1.50% | 6.48% | 20.42% | -8.76% | 22.52% | 14.34% | 13.93% | 2.80% | 10.67% | 9.26% |
| Cat: TD 2035 | -1.76% | 7.57% | 18.43% | -7.04% | 22.04% | 14.04% | 13.76% | 3.37% | 10.61% | 9.36% |
| Ind: Morn LiMod 2035 | -2.58% | 10.07% | 18.52% | -6.82% | 23.04% | 13.38% | 13.63% | 3.89% | 10.42% | 9.44% |
| Quart Rank | 2nd | 4th | 1st | 4th | 2nd | 2nd | 2nd | 3rd | 3rd | 3rd |
| Percentile Rank | 43rd | 83rd | 10th | 97th | 39th | 49th | 47th | 65th | 54th | 61st |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2040 R5 | -1.65% | 6.79% | 21.83% | -9.47% | 24.11% | 15.09% | 15.74% | 3.52% | 11.67% | 10.01% |
| Cat: TD 2040 | -1.99% | 7.95% | 19.52% | -7.74% | 23.19% | 14.56% | 15.47% | 4% | 11.45% | 9.97% |
| Ind: Morn LiMd 2040 | -2.83% | 10.61% | 19.87% | -7.65% | 24.35% | 13.09% | 15.35% | 4.46% | 11.13% | 9.98% |
| Quart Rank | 2nd | 4th | 1st | 4th | 2nd | 2nd | 3rd | 3rd | 2nd | 3rd |
| Percentile Rank | 46th | 80th | 7th | 95th | 35th | 47th | 51st | 61st | 50th | 55th |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2045 R5 | -1.55% | 6.76% | 22.05% | -9.72% | 24.83% | 15.52% | 17.53% | 4.43% | 12.49% | 10.52% |
| Cat: TD 2045 | -1.87% | 7.93% | 20.51% | -8.14% | 24.35% | 15.10% | 16.63% | 4.42% | 12.06% | 10.43% |
| Ind: Morn LiMod 2045 | -3.03% | 10.84% | 20.53% | -8.17% | 24.97% | 12.95% | 16.36% | 4.80% | 11.54% | 10.25% |
| Quart Rank | 2nd | 4th | 1st | 4th | 2nd | 2nd | 1st | 3rd | 2nd | 3rd |
| Percentile Rank | 42nd | 82nd | 13th | 92nd | 44th | 49th | 23rd | 52nd | 42nd | 53rd |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2050 R5 | -1.56% | 6.74% | 22.08% | -9.77% | 24.90% | 15.49% | 17.50% | 4.35% | 12.47% | 10.51% |
| Cat: TD 2050 | -2.01% | 8.22% | 20.67% | -8.41% | 24.54% | 15.25% | 17.12% | 4.59% | 12.25% | 10.55% |
| Ind: Morn LiMod 2050 | -3.19% | 10.89% | 20.78% | -8.41% | 25.09% | 12.91% | 16.60% | 4.81% | 11.64% | 10.29% |
| Quart Rank | 2nd | 4th | 1st | 4th | 2nd | 3rd | 1st | 3rd | 3rd | 3rd |
| Percentile Rank | 44th | 81st | 16th | 88th | 49th | 54th | 23rd | 56th | 42nd | 58th |

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| JPM SmtRet 2055 R5 | -1.61% | 6.81% | 22.01% | -9.69% | 24.89% | 15.48% | 17.53% | 4.32% | 12.48% | 10.51% |
| Cat: TD 2055 | -1.71% | 8.00% | 21.08% | -8.44% | 24.91% | 15.47% | 17.30% | 4.64% | 12.38% | 10.66% |
| Ind: Morn LiMod 2055 | -3.34% | 10.90% | 20.95% | -8.57% | 25.05% | 12.91% | 16.50% | 4.69% | 11.59% | 10.25% |
| Quart Rank | 2nd | 4th | 1st | 4th | 3rd | 3rd | 2nd | 3rd | 3rd | 3rd |
| Percentile Rank | 48th | 82nd | 23rd | 84th | 55th | 55th | 40th | 55th | 56th | 60th |

## Non-Target Date Funds

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| Am Gro of Am R6 | 5.70% | 8.82% | 26.53% | -2.60% | 28.54% | 38.28% | 19.69% | 4.32% | 18.64% | 16.72% |
| Cat: Large Gro | 3.60% | 3.23% | 27.67% | -2.09% | 31.90% | 35.86% | 20.45% | 5.75% | 18.74% | 17.65% |
| Ind: Morn Lar Mid Gro | 3.84% | 5.46% | 27.12% | -1.40% | 34.98% | 37.24% | 26.37% | 13.14% | 22.15% | 19.69% |
| Quart Rank | 2nd | 1st | 3rd | 3rd | 4th | 2nd | 3rd | 3rd | 3rd | 3rd |
| Percentile Rank | 34th | 9th | 57th | 53rd | 55th | 35th | 35th | 65th | 53rd | 64th |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 1-Yr | 3-Yr | 5-Yr |
|---|---|---|---|---|---|---|---|---|---|---|
| Am EuroPac Gro R6 | -0.48% | 1.01% | 31.17% | -14.91% | 27.40% | 25.27% | 2.84% | -9.35% | 8.36% | 8.01% |
| Cat: For Large Gro | 0.95% | -2.14% | 30.87% | -14.08% | 27.83% | 25.48% | 7.69% | -6.83% | 9.62% | 8.92% |
| Ind: MorngloexUS | -2.44% | 0.52% | 29.21% | -13.21% | 25.92% | 20.71% | 4.71% | -6.12% | 8.49% | 8.14% |
| Quart Rank | 3rd | 1st | 2nd | 3rd | 3rd | 2nd | 4th | 3rd | 3rd | 3rd |
| Percentile Rank | 66th | 20th | 44th | 58th | 59th | 33rd | 80th | 74th | 70th | 63rd |

**Note: 1-yr, 3-yr, and 5-yr returns are as of March 31, 2022.**

69.     Swiss Re did not give consideration to category and index returns, quartile rankings, and percentile rankings. At least 8 of their Target Date Funds and 2 of their non-Target Date Funds did not perform well respective to these measurements.

70.     Exacerbating Defendants' imprudent choice to add and retain the JPM TDFs is the suite's role as the Plan's Qualified Default Investment Alternative ("QDIA") for as long as it has been an option in the Plan investment menu. A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The JPM TDF with the target year that is closest to a participant's assumed retirement age (age 65) has served as the QDIA in the Plan throughout the pertinent period.

71.     Given the vast majority of plan participants in general, of which the Plan participants are no exception, are not sophisticated investors, they largely, by default, concentrate their retirement assets in TDFs. As such, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset

categories. Indeed, throughout the Class Period, approximately 31%-34% of the
Plan's assets were invested in the JPM TDFs.

72.     Measured against appropriate, available alternative TDF suites, the
JPM TDFs are a vastly inferior retirement solution. Throughout the Class Period,
there were many TDF offerings that consistently and dramatically outperformed
the JPM TDFs, providing investors with substantially more capital appreciation. It
is apparent, given the continued presence of the JPM TDFs in the Plan's investment
menu, that Defendants failed to scrutinize the performance of the JPM TDFs
against any of the more appropriate alternatives in the TDF marketplace.
Accordingly, the Plan's investment in the JPM TDFs has resulted in participants
missing out on millions of dollars in retirement savings growth that could have been
achieved through an investment in any of the below proposed alternative TDFs, and
indeed many other options.

73.     A prudent fiduciary evaluates TDF returns not only against an
appropriate index or a group of peer TDFs, but also against specific, readily
investable alternatives to ensure that participants are benefitting from the current
TDF offering.

74.     While no one can predict exactly which investments will out-perform
other investments or which decision is the best, prudence requirements may be met
by examining investments for appropriate factors such as the risk of loss, the
opportunity for return, diversification, liquidity, current return and projected
return. DOL guidance states that appropriate consideration or alternatively,
procedural due diligence, means ensuring investment decisions are reasonable, and
applicable to the plan's design:

> Appropriate consideration shall include, but is not
> necessarily limited to, (i) A determination by the fiduciary
> that the particular investment or investment course of

action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action.

29 C.F.R. § 2550.404a-1.

75.     Fiduciary duties do not end at the selection process. There is a continuing duty to monitor investments or service providers after the selection process. Tibble v. Edison, 135 S. Ct. 1823, 1829 (2015) ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting…at the outset").

76.     Swiss Re's Defined Contribution would be categorized, at the very least, as "large," meaning its scale gave them access to the largest Target Date Fund providers and their lowest cost expense ratios: Fidelity, American, and TRowe Price. On a relative basis, this should have been the most obvious comparatives. Below is a return comparison, as of 03/31/2022, of some of the most popular Target Date Funds/Investments that are available:

24

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2025 R5 | 0.36% / 95th | 7.48% / 77th | 6.98% / 78th |
| Fid Freedom 2025 K | 1.04% / 75th | 9.45% / 21st | 8.32% / 18th |
| Fid Freedom 2025 K6 | 1.19% / 69th | 9.58% / 15th | NA |
| Fid Bl TD 2025 Q CIT | 1.02% / NA | 9.42% / NA | 8.31% / NA |
| Am 2025 TD Tret R6 | 3.65% / 7th | 9.64% / 12th | 8.62% / 11th |
| TR Price Ret I 2025 I | 2.29% / 29th | 10.28% / 3rd | 9.18% / 1st |
| Vang TD Ret I 2025 | 1.86% / 42nd | 8.92% / 38th | 8.14% / 32nd |
| S&P TD 2025 | 2.88% | 8.56% | 7.71% |

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2030 R5 | 1.31% / 87th | 8.65% / 76th | 8.03 / 72nd |
| Fid Freedom 2030 K | 1.52% / 82nd | 10.49% / 21st | 9.43% / 16th |
| Fid Freedom 2030 K6 | 1.64% / 78th | 10.61% / 15th | NA |
| Fid Bl TD 2030 Q CIT | 1.48% / NA | 10.52% / NA | 9.27% / NA |
| Am 2030 TD Tret R6 | 3.93% / 15th | 10.70% / 12th | 9.71% / 8th |
| TR Price Ret I 2030 I | 2.64% / 36th | 11.21% / 4th | 9.97% / 1st |
| Vang TD Ret I 2030 | 2.53% / 47th | 9.84% / 46th | 8.85% / 42nd |
| S&P TD 2030 | 3.70% | 9.65% | 8.56% |

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2035 R5 | 2.80% / 65th | 10.67% / 54th | 9.26% / 61st |
| Fid Freedom 2035 K | 2.49% / 74th | 12.21% / 4th | 10.50% / 8th |
| Fid Freedom 2035 K6 | 2.60% / 69th | 12.38% / 1st | NA |
| Fid Bl TD 2035 Q CIT | 2.54% / NA | 12.29% / NA | 10.57% / NA |
| Am 2035 TD Tret R6 | 2.93% / 15th | 10.70% / 12th | 9.71% / 5th |
| TR Price Ret I 2035 I | 4.56% / 19th | 12.36% / 1st | 11.14% / 1st |
| Vang TD Ret I 2035 | 3.29% / 44th | 10.77% / 50th | 9.57% / 48th |
| S&P TD 2035 | 4.73% | 10.90% | 9.50% |

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2040 R5 | 3.52% / 61st | 11.67% / 50th | 10.01% / 55th |
| Fid Freedom 2040 K | 3.36% / 65th | 13.32% / 3rd | 11.19% / 8th |
| Fid Freedom 2040 K6 | 3.47% / 62nd | 13.48% / 1st | NA |
| Fid Bl TD 2040 Q CIT | 3.40% / NA | 13.46% / NA | 11.23% / NA |
| Am 2040 TD Tret R6 | 4.67% / 32nd | 13.08% / 6th | 11.72% / 1st |
| TR Price Ret I 2040 I | 3.18% / 70th | 12.81% / 14th | 11.25% / 7th |
| Vang TD Ret I 2040 | 4.10% / 47th | 11.68% / 50th | 10.28% / 41st |
| S&P TD 2040 | 5.48% | 11.78% | 10.15% |

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2045 R5 | 4.43% / 52nd | 12.49% / 42nd | 10.52% / 53rd |
| Fid Freedom 2045 K | 3.32% / 71st | 13.33% / 5th | 11.19% / 16th |
| Fid Freedom 2045 K6 | 3.44% / 68th | 13.50% / 2nd | NA |
| Fid Bl TD 2045 Q CIT | 3.46% / NA | 13.46% / NA | 11.25% / NA |
| Am 2045 TD Tret R6 | 4.45% / 51st | 13.27% / 8th | 11.89% / 1st |
| TR Price Ret I 2045 I | 3.32% / 73rd | 13.27% / 10th | 11.56% / 7th |
| Vang TD Ret I 2045 | 4.88% / 42nd | 12.61% / 36th | 10.89% / 33rd |
| S&P TD 2045 | 5.96% | 12.30% | 10.51% |

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2050 R5 | 4.35% / 56th | 12.47% / 53rd | 10.51% / 58th |
| Fid Freedom 2050 K | 3.26% / 75th | 13.33% / 5th | 11.18% / 19th |
| Fid Freedom 2050 K6 | 3.43% / 69th | 13.51% / 2nd | NA |
| Fid Bl TD 2050 Q CIT | 3.47% / NA | 13.46% / NA | 11.25% / NA |
| Am 2050 TD Tret R6 | 4.11% / 57th | 13.27% / 8th | 11.95% / 1st |
| TR Price Ret I 2050 I | 3.39% / 72nd | 13.31% / 9th | 11.60% / 9th |
| Vang TD Ret I 2050 | 5.07% / 41st | 12.74% / 38th | 10.96% / 37th |
| S&P TD 2050 | 6.16% | 12.56% | 10.72% |

| Target Date Fund | 1-Yr / % Rank in Cat. | 3-Yr / % Rank in Cat. | 5-Yr / % Rank in Cat. |
|---|---|---|---|
| JMP SmtRet 2055 R5 | 4.32% / 55th | 12.48% / 56th | 10.51% / 60th |
| Fid Freedom 2055 K | 3.33% / 73rd | 13.32% / 11th | 11.18% / 25th |
| Fid Freedom 2055 K6 | 3.51% / 67th | 13.50% / 2nd | NA |
| Fid Bl TD 2055 Q CIT | 3.42% / NA | 13.44% / NA | 11.25% / NA |
| Am 2055 TD Tret R6 | 3.76% / 62nd | 13.13% / 20th | 11.86% / 1st |
| TR Price Ret I 2055 I | 3.44% / 70th | 13.32% / 10th | 11.61% / 10th |
| Vang TD Ret I 2055 | 5.05% / 43rd | 12.71% / 42nd | 10.95% / 45th |
| S&P TD 2055 | 6.24% | 12.65% | 10.80% |

77.     These JPM Smart Retirement Target Date R5 funds only beat their S&P Benchmark twice out of 21 times. Perhaps even more perplexing is the fact that these JPM Smart Retirement Target Date R5 funds, over 3- and 5-year period as of 3/31/2022, didn't outperform their Fidelity, American Fund, T.Rowe Price, and Vanguard counterparts once.

78.     Again, Defendants had immediate access to historical and then-current returns data for the JPM TDFs, and could have sought comparative data at any time.

79.     Defendants, however, neglected to undertake an analysis of the Active suite against appropriate peers using the above important performance metrics. Their failure to do so caused Plan participants to miss out on millions in capital appreciation for their retirement savings.

### 4.2.4. Modern Portfolio Theory

80.     Fiduciaries must develop a way to choose and review investments. For a fiduciary, like a Plan Sponsor or Investment Committee, making independent investigations about the merits of investments is at the heart of the prudent person standard. *Fink v. National Savings and Trust Company*, 772 F.2d 951, 957, 6 E.B.C. 2269 (DC Cir. 1985).

81.     The tools of Modern Portfolio Theory give fiduciaries the opportunity to view and offer insights about the risk, return, and volatility aspects "stand-alone," against their respective benchmarks, and alternative investments in the same category. The Uniform Prudent Investment Act validates Modern Portfolio Theory in a prefatory note:

> (UPIA) undertakes to update trust investment law in recognition of the alterations that have occurred in investment practice. These changes have occurred under the influence of a large and broadly accepted body of empirical and theoretical knowledge about the behavior of capital markets, often described as "modern portfolio theory.

82.     When a fiduciary relationship is established and prudence must be exercised, a fiduciary will investigate and review investments in the following purviews, to ensure the best interests of the Plan participants:

a.   Sensitivity to market movements.[4]

b.   Statistical measurement of dispersion about an average, depicting how widely a mutual fund's returns varied over a certain period of time. When an investment has a high standard deviation, the predicted range of performance is wide, implying greater volatility.[5]

c.   Correlation of an investment's returns to its benchmark's returns.[6]

d.   Standard deviation and excess return to determine reward/return per unit of risk, historical risk-adjusted performance.[7]

e.   Upside/downside investment performance—gained more or lost less than—a broad market benchmark during periods of market strength and weakness, and if so, by how much.[8]

f.   Returns in excess of benchmark returns to the volatility of those returns. Measuring an investment manager's ability to generate excess returns relative to a benchmark and attempting to identify the consistency of the investment manager.[9]

83.   The following are 3/5-Year Risk/Return Statistics A/O 1st Quarter 2022:

---

[4] Beta: https://www.morningstar.com/InvGlossary/beta.aspx.

[5] Standard Deviation: https://www.morningstar.com/invglossary/standard_deviation.aspx.

[6] R squared: https://www.morningstar.com/invglossary/r_squared_definition_what_is.aspx.

[7] Sharpe Ratio: https://www.morningstar.com/invglossary/sharpe_ratio.aspx.

[8] Upside/Downside Capture Ratio: https://www.morningstar.com/invglossary/upside-downside-capture-ratio.aspx.

[9] **Information Ratio: https://admainnew.morningstar.com/webhelp/glossary_definitions/mutual_fund/Information_Ratio.htm**.

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2020 R5 | 6.00/5.83 | 8.48/7.59 | 0.63/0.62 | -0.73/-0.6 | 0.93/0.95 | 87.81/93.44 | 95.34/95.94 |
| TRowe Ret I 2020 I | 9.32/8.36 | 11.24/9.73 | 0.77/0.75 | 0.70/0.71 | 1.26/1.23 | 123.57/121.79 119.92/117.06 | 98.30/98.14 |
| Am 2020 Trgt Ret R6 | 8.49/7.57 | 8.22/7.23 | 0.95/0.90 | 0.81/0.61 | 0.92/0.91 | 100.37/88.67 98.63/87.23 | 98.11/98.72 |
| Fidelity Free 2020 K | 8.63/7.69 | 9.97/8.80 | 0.80/0.75 | 0.62/0.54 | 1.11/1.10 | 112.52/109.24 110.97/108.82 | 97.05/97.15 |
| Van Tgt Ret 2020 | 7.87/7.27 | 9.18/8/12 | 0.78/0.76 | 0.55/0.66 | 1.03/1.03 | 104.18/102.44 104.30/101.77 | 99.25/99.25 |
| S&P Tgt Date 2020 | 7.40/6.78% | 8.87/7.86% | 0.76/0.72% | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2025 R5 | 7.48/6.98 | 10.54/9.38 | 0.65/0.63 | -0.63/-0.49 | 1.00/1.00 | 93.30/98.07 95.87/100.22 | 97.37/97.58 |
| Trowe Ret I 2025 I | 10.28/9.18 | 12.55/10.91 | 0.76/0.74 | 0.69/0.72 | 1.19/1.17 | 118.11/116.65 115.52/112.59 | 98.78/98.58 |
| Am 2025 Trgt Ret R6 | 9.64/8.62 | 9.63/8.53 | 0.93/0.88 | 0.72/0.64 | 0.92/0.91 | 99.69/89.54 99.17/88.69 | 98.42/98.05 |
| Fidelity Free 2025 K | 9.45/8.32 | 11.06/9.76 | 0.79/0.74 | 0.49/0.40 | 1.05/1.04 | 105.99/102.62 105.01/102.58 | 97.60/97.65 |
| Van Tgt Ret 2025 | 8.92/8.14 | 10.84/9.56 | 0.76/0.74 | 0.40/0.54 | 1.03/1.03 | 103.37/102.73 103.59/101.97 | 99.45/99.40 |
| S&P Tgt Date 2025 | 8.56/7/71% | 10.44/9.24 | 0.76/0.71% | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2030 R5 | 8.65/8.03 | 12.28/10.94 | 0.65/0.63 | -0.60/-0.35 | 1.00/1.01 | 98.90/100.60 98.33/101.82 | 98.16/98.14 |
| Trowe Ret I 2030 I | 11.21/9.97 | 13.84/12.06 | 0.76/0.74 | 0.71/0.74 | 1.14/1.12 | 113.05/110.72 111.21/107.21 | 98.89/98.61 |
| Am 2030 Trgt Ret R6 | 10.70/9.71 | 11.37/10.10 | 0.88/0.85 | 0.67/0.76 | 0.93/0.93 | 100.06/92.13 100.86/91.31 | 98.64/98.26 |
| Fidelity Free 2030 K | 10.49/9.29 | 12.49/11.14 | 0.79/0.74 | 0.45/0.43 | 1.02/1.03 | 103.50/99.70 104.33/101.19 | 97.80/97.80 |
| Van Tgt Ret 2030 | 9.84/8.85 | 12.10/10.68 | 0.76/0.73 | 0.21/0.34 | 1.00/0.99 | 100.07/98.64 100.42/98.15 | 99.42/99.39 |
| S&P Tgt Date 2030 | 9.65/8.56% | 12.10/10.71% | 0.74/0.70 | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2035 R5 | 10.67/9.26 | 14.31/12.60 | 0.70/0.65 | -0.13/-0.15 | 1.03/1.03 | 99.85/101.27 100.36/102.48 | 98.41/98.38 |
| Trowe Ret I 2035 I | 12.04/10.65 | 14.92/13.00 | 0.76/0.73 | 0.59/0.67 | 1.07/1.06 | 107.01/104.55 106.18/101.82 | 98.82/98.57 |
| Am 2035 Trgt Ret R6 | 12.36/11.14 | 13.72/12.13 | 0.85/0.83 | 0.95/1.10 | 0.99/0.99 | 104.40/98.12 105.57/97.03 | 98.77/98.50 |
| Fidelity Free 2035 K | 12.21/10.50 | 14.87/13.21 | 0.78/0.71 | 0.58/0.50 | 1.07/1.07 | 108.29/105.66 108.33/106.64 | 98.09/98.11 |
| Van Tgt Ret 2035 | 10.77/9.57 | 13.35/11.79 | 0.76/0.72 | -0.12/0.08 | 0.96/0.97 | 96.81/95.44 97.76/95.54 | 99.41/99.39 |
| S&P Tgt Date 2035 | 10.90/9.50% | 13.81/12.18% | 0.74/0.69 | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2040 R5 | 11.67/10.01 | 15.63/13.75 | 0.70/0.65 | -0.06/-0.19 | 1.04/1.04 | 101.41/103.05 101.62/103.79 | 98.72/98.65 |
| Trowe Ret I 2040 I | 12.81/11.25 | 15.84/13.82 | 0.77/0.73 | 0.52/0.61 | 1.05/1.04 | 105.02/102.42 104.42/99.89 | 98.72/98.51 |
| Am 2040 Trgt Ret R6 | 13.08/11.72 | 14.91/13.08 | 0.83/0.81 | 0.72/0.94 | 0.99/0.99 | 103.79/98.77 104.96/97.52 | 98.56/98.41 |
| Fidelity Free 2040 K | 13.32/11.19 | 16.19/14.25 | 0.78/0.71 | 0.63/0.49 | 1.07/1.07 | 109.39/106.81 108.38/107.00 | 98.23/98.30 |
| Van Tgt Ret 2040 | 11.68/10.28 | 14.60/12.90 | 0.75/0.71 | -0.09/0.12 | 0.97/0.98 | 97.82/96.91 99.10/97.57 | 99.44/99.42 |
| S&P Tgt Date 2040 | 11.78/10.15 | 14.95/13.15 | 0.74/0.69 | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2045 R5 | 12.49/10.52 | 16.68/14.54 | 0.71/0.65 | 0.10/0.00 | 1.06/1.05 | 104.24/106.02 103.30/105.55 | 98.91/98.83 |
| Trowe Ret I 2045 I | 13.27/11.56 | 16.47/14.35 | 0.76/0.73 | 0.49/0.58 | 1.05/1.04 | 104.44/102.06 103.94/99.71 | 98.76/98.51 |
| Am 2045 Trgt Ret R6 | 13.27/11.89 | 15.27/13.39 | 0.82/0.81 | 0.48/0.75 | 0.97/0.97 | 101.53/97.14 103.01/95.92 | 98.36/98.58 |
| Fidelity Free 2045 K | 13.33/11.19 | 16.19/14.25 | 0.78/0.71 | 0.48/0.36 | 1.03/1.03 | 104.59/101.94 104.13/102.50 | 98.29/98.37 |
| Van Tgt Ret 2045 | 12.61/10.89 | 15.84/13.92 | 0.75/0.70 | 0.28/0.38 | 1.01/1.01 | 101.64/101.01 102.19/101.20 | 99.51/99.51 |
| S&P Tgt Date 2045 | 12.30/10.51 | 15.62/13.71 | 0.74/0.69 | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2050 R5 | 12.47/10.51 | 16.69/14.52 | 0.71/0.65 | -0.05/-0.18 | 1.04/1.02 | 101.97/103.79 100.14/102.07 | 98.86/98.81 |
| Trowe Ret I 2050 I | 13.31/11.60 | 16.49/14.36 | 0.77/0.73 | 0.39/0.50 | 1.03/1.02 | 102.59/100.27 102.21/97.66 | 98.72/98.51 |
| Am 2050 Trgt Ret R6 | 13.27/11.95 | 15.54/13.61 | 0.81/0.80 | 0.33/0.62 | 0.96/0.96 | 100.66/97.23 102.14/95.63 | 98.14/98.06 |
| Fidelity Free 2050 K | 13.33/11.18 | 16.16/14.22 | 0.78/0.71 | 0.36/0.25 | 1.00/1.01 | 102.21/99.51 101.67/99.80 | 98.27/98.32 |
| Van Tgt Ret 2050 | 12.74/10.96 | 15.88/13.95 | 0.76/0.71 | 0.16/0.24 | 0.99/0.99 | 100.08/99.13 100.47/99.19 | 99.50/99.49 |
| S&P Tgt Date 2050 | 12.56/10.72 | 15.95/14.01 | 0.74/0.69 | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2055 R5 | 12.48/10.51 | 16.65/14.52 | 0.71/0.65 | -0.09/-0.18 | 1.03/1.02 | 100.84/102.32 100.14/102.07 | 98.88/98.81 |
| Trowe Ret I 2055 I | 13.32/11.61 | 16.51/14.37 | 0.77/0.73 | 0.35/0.46 | 1.02/1.01 | 101.52/98.93 101.11/96.68 | 98.65/98.49 |
| Am 2055 Trgt Ret R6 | 13.13/11.86 | 15.57/13.64 | 0.80/0.79 | 0.20/0.51 | 0.96/0.95 | 99.68/96.87 101.28/95.32 | 97.89/97.91 |
| Fidelity Free 2055 K | 13.32/11.18 | 16.16/14.24 | 0.78/0.71 | 0.31/0.21 | 0.99/1.00 | 101.27/98.53 100.92/99.10 | 98.23/98.31 |
| Van Tgt Ret 2055 | 12.71/10.95 | 15.89/13.95 | 0.76/0.71 | 0.05/0.15 | 0.98/0.98 | 99.04/98.07 99.52/98.21 | 99.49/99.49 |
| S&P Tgt Date 2055 | 12.65/10.80 | 16.12/14.14 | 0.74/0.69 | | | | |

| Investment | Return | S/D | S/R | I/R | Beta | Up/Down Cap | R2 |
|---|---|---|---|---|---|---|---|
| JPM SmRt 2060 R5 | 12.43/10.49 | 16.65/14.54 | 0.71/0.65 | -0.14/-0.24 | 1.03/1.02 | 100.43/102.06 99.49/101.62 | 98.88/98.76 |
| Trowe Ret I 2060 I | 13.34/11.61 | 16.50/14.37 | 0.77/0.73 | 0.34/0.41 | 1.01/1.00 | 101.37/98.74 100.56/96.20 | 98.63/98.45 |
| Am 2060 Trgt Ret R6 | 13.10/11.82 | 15.56/13.62 | 0.80/0.79 | 0.17/0.45 | 0.95/0.95 | 99.30/96.60 100.44/94.71 | 97.88/97.90 |
| Fidelity Free 2060 K | 13.36/11.19 | 16.18/14.23 | 0.78/0.71 | 0.32/0.17 | 0.99/0.99 | 101.18/98.36 100.36/98.60 | 98.28/98.32 |
| Van Tgt Ret 2060 | 12.71/10.95 | 15.87/13.94 | 0.76/0.71 | 0.03/0.07 | 0.98/0.98 | 98.75/97.74 98.93/97.71 | 99.49/99.48 |
| S&P Tgt Date 2060 | 12.68/10.87 | 16.16/14.20 | 0.74/0.69 | | | | |

29

84.     Swiss Re is obligated to follow methodologies that consider risk and volatility with regards to choosing and reviewing investments. There is no statistical evidence that Swiss Re utilized any tools of Modern Portfolio Theory or any prudent investment analysis. Swiss Re did not evince any intention to monitor or replace "underperforming and more volatile funds at a higher cost."

## ERISA'S FIDUCIARY STANDARDS

85.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)    Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     By diversifying the investments of the plan as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     Act in accordance with the terms of the plan unless contrary to ERISA.

86.     Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be

held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

87.    Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

88.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

89.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    If, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

90.     Section 502(a)(2) of ERISA, 29 U.S.C § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109. Section 409(a) of ERISA provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ALLEGATIONS

91.     This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed class (the "Class"):

> All participants and beneficiaries in the Swiss Re Corporation Employees' Savings Investment Plan (the "Plan") at any time on or after August 18, 2022 to the date of judgment or such other earlier date that the Court determines is appropriate and just (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

92.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

93.     **Numerosity**. Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States. As a result, the

members of the Class are so numerous that their individual joinder in this action is impracticable.

94.     **Commonality.** There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

> a.      Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;
>
> b.      Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the plan; and
>
> c.      Whether and what form of relief should be afforded to Plaintiffs and the Class.

95.     **Typicality.** Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class. Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class. In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

96.     **Adequacy of Representation.** Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class. Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

97.     **Potential Risks and Effects of Separate Actions.** The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members

that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

98.   **Predominance.** Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certifications.

99.   **Superiority.** A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waster of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

100.   **Manageability.** This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

101.   Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.

Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

102.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure. Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

103.    Therefore, this action should be certified as a class action under Rule 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

## COUNT 1
## BREACH OF FIDUCIARY DUTY

104.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

105.    Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan. In addition, as set forth above, Defendants violated their respective fiduciary

duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

106.   To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

107.   As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

108.   Pursuant to Section 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT 2
## FAILURE TO MONITOR FIDUCIARIES AND CO-FIDUCIARIES

109.   Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

110.   Swiss Re is responsible for appointing, overseeing, and removing members of the Committees, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

111.    In light of its appointment and supervisory authority, Swiss Re had a fiduciary responsibility to monitor the performance of the Committees and their members. In addition, Swiss Re, the Board and the Committees had a fiduciary responsibility to monitor the performance of the members of the respective Committees.

112.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

113.    To the extent that fiduciary monitoring responsibilities of Swiss Re, the Board or the Committees was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

114.    Swiss Re, the Board, and the Committees breached their fiduciary monitoring duties by, among other things:

a.    Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

b.    Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

c.    Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

115.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Swiss Re, the Board and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

116.    Swiss Re, the Board and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

117.    Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT 3
## IN THE ALTERNATIVE, LIABILITY FOR
## KNOWING BREACH OF TRUST

118.    Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

119.    In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

120.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay unreasonable recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demands judgment against Defendants, for the following relief:

    a.    Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above.

    b.    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132.

    c.    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity.

    d.    Attorneys' fees, costs and other recoverable expenses of litigation.

    e.    Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial with respect to all claims so triable.

**NOTICE PURSUANT TO ERISA § 502(H)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated:     August 18, 2022                Respectfully submitted,
                                          **Sedhom Law Group, PLLC**

                                          By: _Rania V. Sedhom_____
                                          Rania V. Sedhom (RS5439)
                                          Matthew J. Scott (5803945)
                                          630 Fifth Avenue, Suite 2508
                                          New York, NY 10111
                                          212-664-1600 (tel.)
                                          212-563-9280 (fax)
                                          rsedhom@bespokelawfirm.com
                                          mscott@bespokelawfirm.com
                                          *Attorneys for Plaintiffs and the Proposed Class*