## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Shawyne Harris, Robert Taylor, and Sidney Dasent, individually and as representatives of a class similarly situated persons, on behalf of the Swiss Re Group U.S. Employee's Savings Investment Plan,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>Swiss Re American Holding Corporation, the Board of Directors of the Swiss Re American Holding Corporation, the Swiss Re American Holding Corporation Governance & Nomination Committee, the Swiss Re American Holding Corporation Audit Committee, the Swiss Re American Holding Corporation Compensation Committee, the Swiss Re American Holding Corporation Finance & Risk Committee, the Swiss Re American Holding Corporation Investment Committee, and Does No. 1-30, whose names are currently unknown,<br><br>       *Defendants*. | Case No. 1:22-cv-07059 (ALC) |

## MEMORANDUM OF LAW
## IN SUPPORT OF SWISS RE DEFENDANTS'
## <u>MOTION TO DISMISS THE COMPLAINT</u>

**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.    Plaintiffs and the Plan ............................................................................ 4

    B.    The Plan's Recordkeeping and Administrative Services ...................... 4

    C.    The Plan's Investment Options .............................................................. 7

    D.    Plaintiffs' Claims ................................................................................. 12

ARGUMENT ............................................................................................................... 12

    A.    Motion to Dismiss Standard for ERISA Fiduciary Breach Claims ..... 12

    B.    Plaintiffs' Excessive Recordkeeping Fee Claim Fails ........................ 13

    C.    Plaintiffs' Imprudent Investment Option Claims Fail ......................... 17

    D.    Plaintiffs' Fail to State a Claim Under Any of their Alternative Legal
           Theories................................................................................................. 24

    E.    Claims Against the Board and Committee Defendants Should Be
           Dismissed Because They Are Not "Persons" under ERISA................. 25

CONCLUSION ............................................................................................................ 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
    47 F.4th 570 (7th Cir. 2022) .........................................................................1, 9, 15

*In re Bear Stearns Cos.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................24

*Coulter v. Morgan Stanley & Co. Inc.*,
    753 F.3d 361 (2d Cir. 2014).................................................................................24

*Cunningham v. USI Ins. Servs., LLC*,
    No. 21 Civ. 1819 (NSR), 2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) ...........15, 24

*David v. Alphin*,
    No. 3:07-CV-11, 2008 WL 5244483 (W.D.N.C. July 22, 2008)..........................25

*Davis v. Washington Univ. in St. Louis*,
    960 F.3d 478 (8th Cir. 2020) ...............................................................................19

*DigitAlb, Sh.a v. Setplex, LLC*,
    284 F. Supp. 3d 547 (S.D.N.Y. 2018)...................................................................4

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
    No. 17-CV-6685 (ALC), 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019)....................... *passim*

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014)...............................................................................12, 16, 22

*Gonzalez v. Northwell Health, Inc.*,
    – F. Supp. 3d –, 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022).................................... *passim*

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ...............................................................................20

*Hughes v. Nw. Univ.*,
    142 S. Ct. 737 (2022)............................................................................................12

*Kong v. Trader Joe's Co.*,
    No. CV 20-05790, 2020 WL 5814102 (C.D. Cal. Sept. 24, 2020).........................16

*Krutchen v. Ricoh USA, Inc.*,
    No. 22-678, 2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ..................................16

*In re Lehman Bros. Sec. & ERISA Litig.*,
    113 F. Supp. 3d 745 (S.D.N.Y. 2015) .................................................................24

*Leimkuehler v. Am. United Life Ins. Co.*,
    713 F.3d 905 (7th Cir. 2013) .....................................................................9, 10

*Matney v. Barrick Gold of N.A., Inc.*,
    No. 2:20-CV-275-TC-CMR, 2022 WL 1186532 (D. Utah Apr. 21, 2022) ......................18, 21

*Mator v. Wesco Distribution, Inc.*,
    No. 2:21-CV-00403, 2022 WL 1046439 (W.D. Penn. Apr. 7, 2022) ...................................16

*Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) ................................................................... *passim*

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) .......................................................................17

*In re Merrill Lynch Inv. Mgt. Funds Securities Litig.*,
    434 F. Supp. 2d 233 (S.D.N.Y. 2006) .................................................................9

*Parmer v. Land O'Lakes, Inc.*,
    518 F. Supp. 3d 1293 (D. Minn. 2021) ................................................................18

*Patterson v. Morgan Stanley*,
    No. 16-CV-6568 (RJS), 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................21, 22

*Perkins v. United Surgical Partners Int'l, Inc.*,
    No. 3:21-CV-00973, 2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ................................16, 19

*In re RCN Litig.*,
    No. 04–5068 (SRC), 2006 WL 753149 (D.N.J. Mar. 21, 2006) ......................................25

*Riley v. Olin Corp.*,
    No. 4:21-cv-01328, 2022 WL 2208953 (E.D. Mo. June 21, 2022) ................................16, 19

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
    718 F. App'x 3 (2d Cir. 2017) ......................................................................24

*Rosen v. Prudential Retirement Insurance & Annuity Co.*,
    No. 3:15-CV-1839, 2016 WL 7494320 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F.
    App'x 3 (2d Cir. 2017) .............................................................................5

*Rosenkranz v. Altru Health System*,
    No: 3:20-cv-168, 2021 WL 5868960 (D.N.D. Dec. 10, 2021) ......................................19, 23

*Sacerdote v. N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) ................................20

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) ................................................................ *passim*

*St. Vincent v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013)..............................................................1, 12, 13, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................5

*White v. Chevron Corp.*,
    No. 16-cv-0793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...........................20

*Young v. GM Inv. Mgmt. Corp.*,
    325 F. Appx. 31 (2d Cir. 2009)....................................................................1, 2, 14

**Statutes**

29 U.S.C. § 1002(9) ................................................................................................25

29 U.S.C. § 1104 (a)(1)(B) .....................................................................................12

29 U.S.C. § 1109(a) ................................................................................................25

## INTRODUCTION

This lawsuit attempts to copy the dozens of recently-dismissed generic lawsuits challenging fund performance and fees in defined contribution retirement plans. Plaintiffs, three former participants in the Swiss Re Group US Employees' Savings Plan (the "Plan"), allege that Defendants acted disloyally and imprudently under ERISA.[1] Lacking direct evidence of any disloyal or imprudent conduct, Plaintiffs ask this Court to infer that Defendants breached their fiduciary duty based on the fees and performance of some of the Plan's investments and its recordkeeping fee. As these lawsuits flood district courts across the country, appellate courts have recently weighed in, clarifying that allegations just like the ones Plaintiffs bring here fail to state a claim. *See Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022), *reh'g denied*, 2022 WL 4372363 (7th Cir. Sep. 21, 2022); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022).

These precedents, in keeping with the Second Circuit's decisions in *St. Vincent v. Morgan Stanley Inv. Mgmt. Inc.* and *Young v. GM Inv. Mgmt. Corp.*, establish that mere allegations of excessive fees or, in hindsight, investment underperformance, are insufficient to state a viable claim. *St. Vincent*, 712 F.3d 705, 718 (2d Cir. 2013); *Young*, 325 F. App'x 31(2d Cir. 2009). Significantly, plaintiffs claiming imprudence based on performance and fees alone must allege a *meaningful benchmark* against which to compare the allegedly high fees or low performance before a court can plausibly infer that the fiduciaries' selection and monitoring processes were deficient. Here, Plaintiffs' allegations fall far short of what established law requires in order to proceed past a motion to dismiss.

---

[1] The named Defendants are: Swiss Re America Holding Corporation, its board of directors (the "Board"), and several purported committees of the Board, most of which do not actually exist.

First, Plaintiffs' claim of allegedly excessive recordkeeping fees is based on gross misstatements contradicted by Plaintiffs' own cited source materials and relies only on two studies that courts have already rejected as inadequate. For starters, Plaintiffs calculate the Plan's recordkeeping fees based on the Plan's public filings by counting *all* expenses paid by the Plan, including amounts paid to *multiple other service providers* for services *other than recordkeeping*, such as legal, accounting, and investment-advice. This is akin to accusing someone of overpaying for airfare by adding together the costs of the flight, the cab to the airport, a meal in the terminal, and the hotel. When Plaintiffs' egregiously sloppy math is corrected, the annual fees paid to the "single provider" of recordkeeping services identified by Plaintiffs (Great-West) comes out to about $40 per participant, *significantly lower* than the $63 per participant fee Plaintiffs claim is reasonable.

Plaintiffs' recordkeeping fee claim also fails because it lacks allegations that the fees were excessive relative to the services rendered, as is required under *Young* and as confirmed by recent circuit court decisions. Instead, Plaintiffs compare the Plan's (miscalculated) 2016-2020 recordkeeping fees to an outdated 1998 "study" and a 2021 survey. Courts across the country have dismissed excessive recordkeeping fee claims based on these *same* surveys because they do not account for differing services rendered by different recordkeepers. Nor is a 2021 survey of an unknown number of similarly-sized plans or a 1998 "study" instructive as to what this Plan could have paid for recordkeeping today. Simply put, Plaintiffs have not alleged a meaningful benchmark for their recordkeeping claim.

Second, Plaintiffs' allegation that some of the Plan's investments cost too much or had modest, intermittent underperformance for short periods of time does not state a claim. As with recordkeeping, Plaintiffs rely on benchmarks that courts have found are not meaningful. For

instance, they point to a survey that itself says it should not be used for benchmarking, and allege that some of the Plan's actively-managed funds had fees that slightly exceeded the average fees reflected in the survey. But the survey average includes fees of both active and passive funds, and other courts have rejected this exact allegation based on the same survey because it is an apples-to-oranges comparison, not the meaningful benchmark that is required.

Similarly, a district court has recently rejected the same "share class" allegation Plaintiffs bring here: that fiduciaries violated ERISA by offering the "R5" institutional share class instead of the "R6" institutional share class. As confirmed by Plan disclosures and public prospectuses, and as at least one district court has found, while the "R6" share class has a lower sticker price, the "R5" share class is cheaper on net once the revenue credit rebate is factored in.

Finally, Plaintiffs' underperformance allegations fail all three of this circuit's requirements to create a plausible inference that fiduciaries failed to monitor investment performance. The alleged underperformance here was not (1) over a ten-year period, (2) substantial, or (3) consistent. Plaintiffs allege only five years of underperformance, and even then, their allegations show that the challenged Plan investments often *outperformed* the Morningstar index and fund category averages that Plaintiffs chose as reference points. Moreover, the intermittent periods of underperformance were modest—1% to 2%, generally. In addition to the Morningstar index and fund category averages, Plaintiffs also allege the JPMorgan Target Date Funds ("JPM TDFs") in the Plan performed worse than three other target date funds available in the market, but offer no allegations as to why these target date funds are meaningful benchmarks for the JPM TDFs. Yet again, other courts have rejected the exact same allegation for want of a meaningful benchmark.

As explained in greater detail below, Plaintiffs' insufficient, incorrect, and self-defeating allegations fail to state a claim and should be dismissed with prejudice.[2]

## BACKGROUND

### A.   Plaintiffs and the Plan

The Complaint describes Swiss Re America Holding Corporation ("SRAH") as "one of the world's leading providers of reinsurance, insurance, and other forms of insurance-based risk transfer, working to make the world more resilient," Compl. ¶ 12. SRAH offers its employees the opportunity to participate in a defined contribution retirement plan, the Plan. *Id*. ¶¶ 1-2, 24. The Plan offers a diverse menu of approximately 13 investment options from which participants can choose, including target date funds. Plaintiffs are three former Plan participants. *Id*. ¶¶ 9-11.

### B.   The Plan's Recordkeeping and Administrative Services

Like all 401(k) plans, there are expenses associated with administering the Plan. The expenses cover a variety of services, including recordkeeping, among others. Recordkeepers manage "the day-to-day operations of the plan," such as "track[ing] the balances of individual accounts, providing regular account statements, offering various other services, and making sure the plan was complying with regulatory requirements." *Matousek*, 51 F.4th at 278 (citation omitted). Plaintiffs allege that the Plan's "single provider" of recordkeeping services is Great-West Life & Annuity Insurance Company ("Great-West"). Compl. ¶¶ 26, 32.

---

[2] Defendants raised these defects by way of a letter filed November 14, 2022 requesting a pre-motion conference in anticipation of filing this motion. In response, Plaintiffs declined the opportunity to amend the Complaint to correct these defects. Therefore, dismissal of the Complaint should be with prejudice. *See, e.g.*, *DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 556–57 (S.D.N.Y. 2018) ("Courts have dismissed claims with prejudice on the basis that the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies.") (internal quotations and citation omitted); *see also* Carter, J.'s Chamber Rule 2.D.ii (following a pre-motion conference, "[i]f the non-moving party elects not to amend its complaint and the motion to dismiss is granted, **it is unlikely that the Court will grant the non-moving party leave to amend**").

Plaintiffs do not allege what recordkeeping services Great-West provides, let alone allege anything about the quality or scope of those services. Instead, Plaintiffs state generically that recordkeeping "services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, providing transaction processing, providing call center support and investment education and guidance, providing participant communications, and providing trust and custodial services." Compl. ¶¶ 32-33.

Plaintiffs allege that Defendants paid *Great-West* approximately $163 to $282 per participant annually for recordkeeping which, Plaintiffs contend, was high when compared to alleged market rates of $34 to $63 per participant. Compl. ¶ 53. But the publicly available Form 5500s referenced in the Complaint confirm *the Plan did not pay anywhere near this amount in recordkeeping*. Instead, the Form 5500s confirm that to calculate alleged "recordkeeping" fees, Plaintiffs added the fees the Plan reportedly paid to **all** its service providers, including the Plan's counsel (Troutman Sanders), its auditor (PwC), its investment advisor (NEPC), and other service providers that are not Great-West and that did not provide recordkeeping services. Compl. ¶ 53; *see, e.g.*, Ex. A (2019 Form 5500 at 7-9); Ex. B (2020 Form 5500 at 7-9); Ex. L (2015-18 Form 5500 Excerpts at 5-6, 39-41, 67-69, 95-97).[3] Plaintiffs then apparently divided the total fees paid to **all** service providers by the number of participants in the Plan each year to calculate the supposed **recordkeeping** fees paid to Great-West. Compl. ¶ 53.

---

[3] On a motion to dismiss, the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *3 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017) ("[T]he Court may also consider matters subject to judicial notice, which include public disclosure documents filed with governmental agencies, such as the Securities and Exchange Commission and the Department of Treasury" and taking judicial notice of the plan's Form 5500s*); Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *1 n.1 (S.D.N.Y. Sept. 18, 2019) (on motion to dismiss, taking judicial notice of "the copies of the relevant documents concerning the Plan, public filings, and required fee disclosures provided to participants of the Plan").

Obviously, this is wrong—and it is contradicted by the Form 5500s on which Plaintiffs rely. For example, Plaintiffs allege that in 2019 the Plan's 4,042 participants paid Great-West $282.43 each for recordkeeping, for a total recordkeeping fee of ***$1,141,582.06***, but the Form 5500 itself states that "[i]n 2019, the Plan paid recordkeeping fees of ***$163,318*** to Great-West." *Id.*; Ex. A at 36. Plaintiffs repeat this error in other years. *See*, *e.g.*, Ex. B (2020 Form 5500 at 7-9, 36) (alleging the Plan paid $986,255.20 when the Form 5500 stated "[i]n 2020, the Plan paid recordkeeping fees of $164,058 to Great-West").[4] According to the Form 5500s, the Plan paid about $40 per participant to Great-West for recordkeeping (*e.g.*, $164,058 to Great-West / 4,042 participants = $40.41).

Plaintiffs then point to two supposed market surveys, including one from 1998 using data *from 1995*, purporting to show that other plans at other points in time paid between $34 to $63 per participant a year for recordkeeping, Compl. ¶¶ 48-49, 53, and from that alone ask this Court to infer that Defendants failed to appropriately monitor the Plan's recordkeeping fees from 2016 to the present.[5] These surveys offer only generic averages and do not differentiate between a range of factors critical to any comparison of fees, including the specific recordkeeping services provided or how fees and services today differ from 27 years ago. *See infra* at 15-17.

---

[4] Plaintiffs also present an "alternative" method for "quantifying RK&A expenses" based on the information in Schedule H of the Forms 5500, alleging that the Plan paid recordkeeping fees from $243.35 to $283.57 per participant from 2015 to 2020. Compl. ¶ 54. But this method also includes fees paid to service providers other than Great-West for services other than recordkeeping fees, such as "investment advisory and management fees" and "management fees." *See, e.g.*, Ex. A at 18.

[5] Plaintiffs reference a 1998 study "submitted by the Pension and Welfare Benefits Administration," but that is incorrect: it was submitted by "Economic Systems, Inc.," an entity for which Plaintiffs provide no information. Compl. ¶ 49; Study of 401(k) Plan Fees and Expenses, attached as Ex. C at 2, 4 (1998 Study) ("The opinions and conclusions [of the study] are those of Economic Systems, Inc., and of the HayGroup and do not necessarily reflect the views of the Department of Labor.").

C.      **The Plan's Investment Options**

Plaintiffs allege that the Plan's investment options made available to participants included "mutual funds, common collective trust funds, a stable value investment option and self-directed brokerage accounts." Compl. ¶ 25. As explained in each of their respective prospectuses, the investment options available to Plan participants represented a broad spectrum of funds pursuing different objectives and employing different investing strategies. *See, e.g.*, 2020 American Funds EuroPacific Growth Fund summary prospectus, attached as Ex. D at PDF p.7 ("The investment adviser to the fund actively manages the fund's investments."); 2020 Vanguard Institutional Index Prospectus, attached as Ex. E at PDF p.4 ("The Fund employs an indexing investment approach designed to track the performance of the S&P 500 Index…"). Plan participants could choose among various actively-managed funds, which try to beat market returns through investments hand-picked by professional investment managers. *E.g.*, Ex. B at 38. Alternatively, Plan participants could choose passive "index" funds, which are designed to keep pace with market returns by automatically following their respective market indices. *Id*. In addition to choosing between actively and passively-managed funds, Plan participants could choose funds that focused on stocks (*i.e.*, equity securities) or bonds, in either United States or international markets. *Id*. All of the Plan's investments charged some form of annual operating expense, but because actively-managed funds "must hire management teams to actively select investments to buy and sell," they "need to charge higher fees." *CommonSpirit*, 37 F.4th at 1169. Finally, the Plan offered a suite of "target date funds"—the JPM TDFs, which are tailored to investors who intend to retire in specific target years (2030, 2035, 2040, *etc.*). Compl. ¶ 65.

7

Plaintiffs make several complaints about this menu of investment options and from that circumstantial evidence ask the Court to conclude that Defendants breached their duty to engage in a prudent process for selecting and monitoring the Plan's investments:

**(1) Expense Ratios**: Plaintiffs claim the Plan offered investments with excessive fees, known as expense ratios, pointing only to a report by the Investment Company Institute and Brightscope (the "Brightscope/ICI Report") that purportedly analyzed average fees for both passive and active funds falling into certain broad investment categories, such as "domestic equity" funds or "target date" funds. Compl. ¶ 60. The report states that it "***is not intended for benchmarking***" because "[t]he fund investment categories used in this report are broad and encompass diverse investment styles within the investment types (*e.g.*, active and index [*i.e.*, passive]); a range of general investment types (such as domestic equity funds, which aggregates growth, sector, alternative strategies, value, and blend); and a variety of arrangements for shareholder services, recordkeeping, or distribution charges." Ex. F, at PDF p.60. Nonetheless, Plaintiffs rely exclusively on that report to assert that several Plan options were too expensive because they were "at or well over the medium [sic] percentile, medium [sic] expense ratio" for the broad investment category listed in the Brightscope/ICI Report. Compl. ¶ 61.

Specifically, Plaintiffs point to the JPM TDFs (which employ a blended strategy and invest in a mixture of *actively*-managed funds <u>and</u> *passively*-managed funds), American Funds Growth Fund of America (an *actively*-managed mutual fund), Dodge & Cox Stock Fund (an *actively*-managed mutual fund), and PIMCO Total Return Fund (an *actively*-managed mutual fund) as having above-average fees according to the survey that is not supposed to be used to compare fees. Compl. ¶ 60; 2020 PIMCO Total Return Summary Prospectus, attached as Ex. G at PDF p.4 ("Management Risk [is] the risk that the investment techniques and risk analyses applied by

PIMCO will not produce the desired results"); 2020 Dodge & Cox Stock Fund Summary Prospectus, attached as Ex. H at PDF p.3 ("[T]he Fund typically invests in companies that, in Dodge & Cox's opinion, appear to be temporarily undervalued by the stock market but have a favorable outlook for long-term growth."). In other words, Plaintiffs ask the Court to infer that the Defendants failed to adequately monitor the Plan's investments because the Plan included four actively-managed or active-blend funds that, by the very nature of actively-managed funds, have higher management fees than the average fees listed in a survey that included *passively*-managed funds, funds with different strategies, and a variety of fee arrangements.

**(2) JPM TDF Share Classes**: A single fund is often available in a variety of share classes, with each share class charging different fees and having different investment rules and limitations. As the Seventh Circuit has explained, "[w]ithin a single mutual fund, there are often several different expense-ratio/revenue-sharing levels available, because most mutual funds offer multiple 'share classes' to investors. Although each share class within a given fund is invested in an identical portfolio of securities, the classes have differing price structures." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013)*. "A 'retail' share class pays the same fees as the general public, while an 'institutional' share class pays a discounted rate." *Albert*, 47 F.4th at 574.

Plaintiffs allege that for the JPM TDFs, Defendants offered the "R5" institutional share class, but should have offered the "R6" institutional share class because its expense ratio was allegedly 10 basis points ("bp") lower than the R5 share class.[6] Compl. ¶¶ 62-63. However, this allegation only mentions the expense ratios of the share classes and does not account for the

---

[6] "A basis point is 1/100th of a percentage point" and a common measure of investment fees. *In re Merrill Lynch Inv. Mgt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 235 n.5 (S.D.N.Y. 2006).

revenue credit that Plan investors received for investing in this fund. *See* Notice of Investment Returns & Fee Comparison, attached as Ex. I at PDF p.6. This revenue credit is clearly disclosed to participants in the annual fee notices that they received.[7]

Plan documents—namely, the annual Notice of Investments Returns & Fee Comparison disclosure to Plan participants upon which the Complaint's allegations are drawn—state that the "R5" share class for the JPM TDFs provides an annual revenue credit of 0.20%. Ex. I, at PDF p.6. That revenue credit is "allocated to participants who are invested in the" JPM TDFs—*i.e.*, these participants receive a 0.20% *rebate*. *Id.* Plaintiffs conspicuously omit this fact in their allegations. It is a better deal, of course, to pay a sticker price of 10 bps more if you then receive a 20 bp rebate. Factoring in the revenue credit, the JPM TDFs are *cheaper* when offered in share class R5 rather than R6.

**(3) Performance of Certain Plan Investment Options**: Plaintiffs allege that two of the Plan's investment options and the TDF suite did not perform "well" relative to other funds in their respective Morningstar category and Morningstar index Plaintiffs selected. Plaintiffs assert that the Plan's investments are "inferior" because they modestly underperformed other investment options available in the market over periods shorter than ten years. Compl. ¶¶ 69, 72, 77. Here too, Plaintiffs ignore obvious and inconvenient truths. The chart included in the Complaint shows many periods in which the Plan's investment options performed *better* than the category or index—or both—that Plaintiffs selected. Compl. ¶ 68. For example, Plaintiffs allege that:

- Looking at year-end returns, the American Growth Fund performed in the 35th percentile or better for its Morningstar "category" ***for most of the years Plaintiffs measured.*** This includes performing as high as the 9th percentile in 2016, 34th in 2015, and the 35th in 2020

---

[7] By way of background, some funds offer "revenue sharing" or a "revenue credit," whereby a mutual fund will refund a portion of the fees charged to investors to the plan's recordkeeper, in exchange for the recordkeeper handling certain services that the mutual fund otherwise would handle itself. *Leimkuehler*, 713 F.3d at 909. That revenue credit can be rebated back to plan participants, which has the end result of reducing the fees that participants pay for that fund. *Id.*

and 2021. The American Growth Fund also outperformed the index Plaintiffs identified in three of the seven years measured. *See id*. ¶ 68, p. 22 ("AmGro of Am R6," "Ind: Morn Lar Mid Gro," and "Percentile Rank" rows).

- Looking at year-end returns, the American EuroPacific Growth R6 performed in the 44th percentile or better for its Morningstar "category" for **three of the seven years** Plaintiffs measure. This includes performing as high as the 20th percentile in 2016, 33rd in 2020, and 44th in 2017. The American EuroPacific Growth R6 also **outperformed the index Plaintiffs identified in most of the years measured**. *See id*. ¶ 68, p. 22 ("Am EuroPac Grow R6," "Ind: Morn Lar Mid Gro," and "Percentile Rank" rows).

- The JPM 2045 TDF performed in the 13th percentile in 2017, 23rd in 2021, 42nd in 2015, 44th in 2019, an 49th in 2020. In other words, **Plaintiffs allege it performed in the top half of its "category" average for most of the years measured**. So too for the JPM 2035 and JPM 2050 funds. *See id*. ¶ 68, p. 21 ("Percentile Rank" and "Cat:" rows).

- The JPM 2035, 2040, 2045, 2050, and 2055 **outperformed** the index Plaintiffs identified for most of the years measured. *See id*. ¶ 68, p. 21 ("Ind:" row).

- The JPM 2035, 2040, 2045, 2050, and 2055 TDFs outperformed the index **and** category averages Plaintiffs identified for either the three- or five-year period, or both, as of March 31, 2022. *See id*. ¶ 68, pp. 21-22 ("Ind:" and "Cat:" rows; "1-year, 3-year, and 5-yr returns are as of March 31, 2022").

Plaintiffs' chart also shows that during the intermittent periods in which the Plan's investment options underperformed, that underperformance was modest, at best. For example, Plaintiffs allege:

- The American Growth Fund performed in the 53rd percentile in 2018 and 57th percentile in 2017 (i.e., years in which the fund allegedly underperformed). In those years, the fund performed within 1.2% of the index and category averages Plaintiffs identified. *See id*. ¶ 68, p. 22 ("Percentile Rank," "Cat:" and "Ind:" rows).

- The American EuroPacific Growth performed between the 58th and 80th percentile for four of the seven years Plaintiffs measured. In *all* those years, the fund performed within 2% of the index and category averages Plaintiffs identified, including beating the index in two of those years. Its three-year and five-year returns Plaintiffs identify are within .13% of the index and 1.26% of the category average. *See id*. ¶ 68, p. 22 ("Percentile Rank," "Cat:" and "Ind:" rows).

- *Every* vintage of the JPM TDF performed within 2.26% of the index and category average Plaintiffs identified over a three- and five-year period. In almost all instances, the performance was within 1%. To provide a Court with a few visual examples from the Complaint, Plaintiffs ask the Court to find that the JPM TDFs consistently and substantially

11

underperformed based on the 1-year, 3-year, and 5-year returns as measured on March 31, 2022, excerpted below. *See id.* ¶ 68, p. 21 ("Cat:" and "Ind:" rows).

| | JPM 2040 | | | JPM 2045 | | | JPM 2050 | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1-Yr | 3-Yr | 5-Yr | 1-Yr | 3-Yr | 5-Yr | 1-Yr | 3-Yr | 5-Yr |
| JPM Fund | 3.52% | 11.67% | 10.01% | 4.43% | 12.49% | 10.52% | 4.35% | 12.47% | 10.51% |
| Category Avg. | 4% | 11.45% | 9.97% | 4.42% | 12.06% | 10.43% | 4.59% | 12.25% | 10.55% |
| Index | 4.46% | 11.13% | 9.98% | 4.80% | 11.54% | 10.25% | 4.81% | 11.64% | 10.29% |

**D.      Plaintiffs' Claims**

Based on these allegations, Plaintiffs assert three claims: (1) breach of fiduciary duty under Section 404(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B), and (D); (2) breach of the duty to monitor Plan fiduciaries and co-fiduciaries; and (3) in the alternative, liability for knowing breach of trust.

**ARGUMENT**

**A.      Motion to Dismiss Standard for ERISA Fiduciary Breach Claims**

In the ERISA class action context, a motion to dismiss is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value[.]" *St. Vincent*, 712 F.3d at 719. The Supreme Court has therefore recognized that courts analyzing the plausibility of imprudence claims must give "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

In order to state a claim, a plaintiff must offer well-pleaded factual allegations showing that the plan fiduciaries failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person would use. 29 U.S.C. § 1104 (a)(1)(B). "In

other words . . . this standard focuses on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *St. Vincent*, 712 F.3d at 716 (citation omitted). Where, as here, the Complaint contains no allegations directly related to the process by which Defendants managed the Plan's investments or fees, Plaintiffs must allege facts that "give rise to a 'reasonable inference' that the defendant committed the alleged misconduct . . . thus permit[ting] the court to infer more than the mere possibility of misconduct." *Id.* at 727 (citation omitted) ("For a plaintiff alleging a breach of fiduciary duty under ERISA, this standard generally requires the plaintiff to allege facts that, if accepted as true, would show that a prudent fiduciary in like circumstances *would have acted differently*.") *Id.* (citations omitted) (emphasis added). *See Ferguson*, 2019 WL 4466714, at *12 ("Plaintiffs failed to provide additional sufficient factual allegations to support why a prudent investor in . . . Defendants' shoes would have never arrived at these decisions.").

### B.    Plaintiffs' Excessive Recordkeeping Fee Claim Fails

With no direct allegations that Defendants failed to monitor recordkeeping fees, Plaintiffs ask this Court to infer that Defendants lacked a prudent process based on the supposed price the Plan paid for recordkeeping as compared to inapt and outdated points of comparison. This theory is implausible for three reasons.

First, Plaintiffs' claim of allegedly excessive recordkeeping fees is belied by their own cited source materials, and their "calculation" of recordkeeping fees is obviously wrong. As the basis for the assertion that "[t]he Plan participants overpaid recordkeeping fees" to Great-West, the Plan's recordkeeper, Plaintiffs claim the Plan's filings show that participants paid approximately $163 to $283 per year in fees from 2015–2020. Compl. ¶¶ 53-55. But a review of

those filings confirms that Plaintiffs are counting as "recordkeeping" fees *all* expenses paid by the Plan, including amounts paid to seven *other service providers* for services other than recordkeeping. *Supra* at 14, n.8.[8] The Form 5500 service codes reflect that these other entities, besides Great-West, provided services *other than recordkeeping*, such as investment advisory, investment management, consulting, auditing, and legal services. *Id*. This is unsurprising considering that these entities include a law firm, an auditor, and a consultant, among others, and Plaintiffs allege that Great-West was the "single provider" of recordkeeping fees. Compl. ¶ 32. Yet Plaintiffs count *all* of the fees to these eight providers as recordkeeping fees.[9] *Id*. ¶¶ 53-54.

When Plaintiffs' egregiously sloppy math and flawed premise are corrected, the annual fees paid to the "single provider" of recordkeeping services identified by Plaintiffs (Great-West) come out to about $40 or less per participant. *Id*. ¶¶ 32, 48; *supra* at 6. That is significantly lower than the $63 per participant fee that Plaintiffs claim "can be used as [sic] to evaluate whether the amount paid by Plaintiffs in recordkeeping fees was excessive." *Id*. ¶ 49. Plaintiffs, of course, cannot assert a claim of excessive recordkeeping fees when the fees the Plan paid are within the range of what Plaintiffs allege to be reasonable.

Second, the recordkeeping fee claim fails because Plaintiffs have not met their burden to allege "that the fees were excessive relative to the services rendered." *Young*, 325 F. App'x at 33. To survive this Motion, Plaintiffs must do more than allege that the Plan participants paid high fees – they must "identify similar plans offering the same services for less." *Matousek*, 51 F.4th at

---

[8] For example, the 2020 Form 5500 on which Plaintiffs rely reflects that the Plan paid fees to 1) Great-West; 2) Advised Asset Group; 3) JPMorgan Investment Management; 4) NEPC; 5) PwC; 6) Troutman Sanders; 7) Aon Consulting; and 8) GWFS Equities Inc. Ex. B at 7-9.

[9] To illustrate, Plaintiffs allege the Plan paid $986,255.20 in 2020, which is adding together the fees of the above-mentioned service providers reflected in the Form 5500: $168,058 + $507,872 + $152,861 + $56,250 + $46,508 + $32,045 + $13,000 + $9,669 = $986,263. Note, Plaintiffs' math is still off, even when doing the wrong calculation.

279; *Albert*, 47 F.4th at 579–80 (affirming dismissal of recordkeeping claim "devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided"). Courts in the Second Circuit have rejected similar claims when plaintiffs fail to meet this pleading burden. *See*, *e.g.*, *Ferguson*, 2019 WL 4466714, at *8 ("Plaintiffs fail to allege that the administrative 'fees were excessive relative to the services rendered.'") (citation omitted); *Cunningham v. USI Ins. Servs., LLC*, 2022 WL 889164, at *4–5 (S.D.N.Y. Mar. 25, 2022) (dismissing claim where plaintiff failed to allege that defendants' recordkeeping fees were "excessive in relation to the specific services [the recordkeeper] provides to the Plan"). For example, in *Gonzalez v. Northwell Health, Inc.*, the Eastern District of New York recently rejected similar recordkeeping fee allegations because the plaintiff failed to allege "that there are entities that could provide the Plan with services comparable to [the recordkeeper's] at lower rates, ***let alone name any of those providers or describe their service-based pricing models***." – F. Supp. 3d –, 2022 WL 4639673, at *10 (E.D.N.Y. Sept. 30, 2022) (emphasis added).

Plaintiffs do not identify the services Great-West rendered to the Plan. Nor do they identify a *single plan* that paid less than Defendants paid, let alone describe what recordkeeping services comparator plans received. Instead, Plaintiffs base their entire claim on the contention that Plan participants paid more in recordkeeping fees than supposed industry averages from a 1998 Department of Labor report (*using data from 1995*) and a 2021 NEPC survey. Compl. ¶¶ 47-48. But claims based on supposed industry averages fail because these reports are by definition broad-brush comparisons of dissimilar plans and recordkeepers that do not account for the differences in services rendered. *See*, *e.g.*, *Matousek*, 51 F.4th at 278 (affirming dismissal where plaintiffs failed to plead "a sound basis for comparison—a meaningful benchmark" as necessary to plausibly allege a plan paid excessive recordkeeping fees).

Accordingly, courts have dismissed fiduciary breach claims based on essentially the same sources Plaintiffs proffer here because they do not provide a meaningful benchmark. *See*, *e.g.*, *Riley v. Olin Corp.*, 2022 WL 2208953, at *4 (E.D. Mo. June 21, 2022) ("[C]ourts throughout the country routinely reject the 2019 NEPC survey—among others—as a sound basis for comparison because it lacks in detail," including lacking detail about the "*specific services* the recordkeeper provided to the *specific plan* at issue") (citation omitted); *Mator v. Wesco Distrib., Inc.*, 2022 WL 1046439, at *7 (W.D. Pa. Apr. 7, 2022) ("the 2019 NEPC survey does not contain any information about the services provided to the surveyed plans" and it was therefore "an incongruent comparison"); *Perkins v. United Surgical Partners Int'l, Inc.*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) (dismissing fiduciary breach claim and rejecting reliance on NEPC Survey); *Krutchen v. Ricoh USA, Inc.*, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022) (dismissing excessive recordkeeping fee claim because plaintiffs "allege nothing about the services chosen by. . . the plans included in the NEPC survey").[10]

<u>Third</u>, even if Plaintiffs' two sources said anything about the services provided, the surveys still fall short of providing meaningful benchmarks for comparison. For example, Plaintiffs provide no explanation why a 1998 study from Economic Systems, Inc. using 1995 data sheds light on what Defendants should have paid Great-West for recordkeeping from 2016 to the present. This outdated study simply is not a meaningful benchmark. *See Kong v. Trader Joe's Co.*, 2020 WL 5814102, at *5 (C.D. Cal. Sept. 24, 2020) (dismissing fiduciary beach claim and rejecting comparison to the 1998 study Plaintiffs cite here because "[o]ne study from 1998 cannot support

---

[10] Further underscoring that Plaintiffs' two surveys are not meaningful benchmarks, the surveys contradict each other. While the 1998 DOL study purports to show that plans with under 1,000 participants pay between $34-$42 per participant for recordkeeping (¶ 48), the page Plaintiffs cite in the 2021 NEPC study shows that plans with over 1,000 participants pay between $60-$215 per participant, with a median of approximately $140. *Id.*; 2021 NEPC Study, attached as Ex. J at PDF p.13.

a claim for excessive fees that occurred starting in 2014" and finding the study "unpersuasive"). And while Plaintiffs describe the 2021 NEPC survey as showing average recordkeeping fees "for a plan with 1,000-5,000 participants based on 137 defined contribution and deferred compensation plans," they blatantly misrepresent this document, too. Compl. ¶ 49. The survey has four groups ranging in size (0–1,000, 1,000–5,000, 5,000–15,000, and 15,000+) and those *four groups* represent 137 different plans. Plaintiffs have no way of knowing how many plans were in the 1,000-5,000 group. Ex. J at PDF p.13 (2021 NEPC Survey).

Lacking plausible allegations of what the Plan paid for recordkeeping or that the Plan paid more than it should have, Plaintiffs' fiduciary breach claim based on circumstantial allegations of excessive recordkeeping fees fails as a matter of law.

### C. Plaintiffs' Imprudent Investment Option Claims Fail

Plaintiffs next assert that Defendants must have engaged in a flawed decision-making process because they offered Plan participants certain investment options that allegedly had excessive fees or underperformed. Plaintiffs have not come close to creating an inference of a flawed decision-making process under any of these theories.

**Expense Ratio Claim:** Plaintiffs claim that Defendants had a flawed decision-making process because four Plan investments had expense ratios that slightly exceeded median expense ratios reflected in a Brightscope/ICI Report. Compl. ¶¶ 60-61. As with their deficient recordkeeping fee allegations, this claim fails because Plaintiffs have not met their burden to plead a "sound basis for comparison—a meaningful benchmark." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822–23 (8th Cir. 2018); *Northwell Health, Inc.*, 2022 WL 4639673, at *8 (citing *Meiners* and rejecting plaintiffs' investment claim for want of a "meaningful comparator").

17

Plaintiffs present a chart that purports to compare certain of the Plan's investments to other funds allegedly in the same "category" in the Brightscope/ICI Report. Compl. ¶ 60. The "categories" ("TD," "Dom. Equity," "Int'l Equity," and "Dom. Bonds") are not defined or explained, and for this reason do not provide a plausible basis upon which the Court can assess the allegations of excessive investment fees. *See Matousek*, 51 F.4th at 281 (rejecting proffered comparator on a motion to dismiss and finding that "[w]ith so little information, we have no way of knowing whether the peer-group funds provide a sound basis for comparison"). Among the missing details are whether the funds in those categories "hold similar securities, have similar investment strategies, and reflect a similar risk profile" as the Plan investments that Plaintiffs have singled out. *Id*. Lacking these details, Plaintiffs' allegations likewise fall short.

If there was any doubt on whether the Brightscope/ICI Report is a meaningful benchmark, the Court need not look beyond the report itself, which states "***it is not intended for benchmarking***." Ex. F, at PDF p.3, 19, 60. As the report recognizes, it is not a proper basis for comparison because "[t]he fund investment categories used in this report are broad and encompass diverse investment styles within the investment types (e.g., active and index); a range of general investment types (such as domestic equity funds, which aggregates growth, sector, alternative strategies, value, and blend); and a variety of arrangements for shareholder services, recordkeeping, or distribution charges (known as 12b-1 fees)." *Id*. at PDF p.60. Courts agree and have dismissed ERISA fiduciary breach claims premised on the Brightscope/ICI Report. *See Matney v. Barrick Gold of N.A., Inc.*, 2022 WL 1186532, at *6 (D. Utah Apr. 21, 2022), *appeal filed*, No. 22-4045 (10th Cir. May 20, 2022) (finding the "expense ratios from the ICI Study do not allow a meaningful analysis"); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1303 (D. Minn. 2021) (dismissing excessive investment fee claim and finding that "the ICI Study median

expense ratios are not meaningful benchmarks" because "it fails to differentiate between passively and actively-managed funds"); *Rosenkranz v. Altru Health System*, 2021 WL 5868960, at \*10 (D.N.D. Dec. 10, 2021) (same); *Perkins*, 2022 WL 2022 WL 824839, at \*6 (dismissing excessive investment fee claim and finding that because the "ICI study does not distinguish between actively and passively managed accounts, it is an insufficient benchmark to plausibly allege imprudence"); *Riley*, 2022 WL 2022 WL 2208953, at \*6 (dismissing excessive investment fee claim because the ICI study was not a meaningful benchmark, rejecting plaintiffs' argument that doing so "impermissibly drags the Court into the factual weeds").

Surveys and averages are particularly inapt as a comparator where, as here, they combine actively- and passively-managed funds. The funds Plaintiffs challenge are actively-managed, which by their very nature "need to charge higher fees, because they must hire management teams to actively select investments to buy and sell, whereas index funds require less management and less upkeep." *CommonSpirit*, 37 F.4th at 1169. Thus, comparing the expenses charged by actively-managed funds to survey results that aggregate data from both active and index funds, as the Brightscope/ICI Report does, is a classic case of "comparing apples and oranges." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) (dismissing ERISA fiduciary breach claim because comparing actively-managed funds to "index funds as a potential benchmark" is "comparing apples and oranges. Index funds are passively managed, whereas [the fund] has an actively managed component."); *Northwell Health, Inc.*, 2022 WL 4639673, at \*9 (citing *Davis* and finding index funds not to be a "meaningful comparator" for active funds); *supra* at 18-19 (listing five cases dismissing fee allegations based on Brightscope/ICI Report because it compares the fees of active funds to passive funds). And of course, including actively-managed funds in a plan's investment lineup—the only thing Plaintiffs' allegations really establish—is not a breach of

any duty. *CommonSpirit*, 37 F.4th at 1165 ("We know of no case that says a plan fiduciary violates its duty of prudence by offering actively managed funds to its employees as opposed to offering only passively managed funds."); *Northwell Health, Inc.*, 2022 WL 4639673, at \*9 ("[I]t is not imprudent for a fiduciary to offer both active and passive investment options.").

**Lower Cost Share Class Claim**: Plaintiffs also hope to give rise to an inference of fiduciary breach by pointing to the JPM TDFs "R5" institutional share class offered in the Plan, when there purportedly was a lower cost "R6" institutional share class available. Compl. ¶¶ 62-63. Specifically, Plaintiffs allege that the fees charged by the R6 share class investors had an expense ratio 10 bps lower than that charged by the R5 share class investors. *Id*. ¶ 63.

Even if that alone was enough to state a claim for imprudence,[11] Plaintiffs' allegations are contradicted by the Plan's annual disclosures to participants, which make clear that participants who invested in the JPM TDFs received an annual revenue credit of 20 bps. *Supra* at 10. Thus, even if the R5 sticker price (i.e., expense ratio) is 10 bps more than the R6 sticker price, once the 20 bps rebate is factored in, the R5 share class is 10 bps cheaper on net:

|                       | Expense Ratio | Rebate | Net Fee |
|-----------------------|---------------|--------|---------|
| JPM TDF 2020 R5[12]   | .53%          | .20%   | .33%    |

---

[11] It is not. Courts regularly find that nothing in ERISA requires fiduciaries to scour the market to find the cheapest investment option available. *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009). While allegations that a plan mostly offered *retail* shares rather than *institutional* shares may state a claim (*Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 109 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022)), merely alleging that defendants offered one fund in an institutional share class and should have chosen a different institutional share class does not state a claim. *See, e.g.*, *Ferguson*, 2019 WL 4466714, at \*6 ("Plaintiffs' allegations that the Plan included high-cost share classes of investment options when lower-cost share classes of those same investment options were available to the Plan do not, as a matter of law, support an inference of a flawed fiduciary process."); *White v. Chevron Corp.*, 2016 WL 4502808, at \*11 (N.D. Cal. Aug. 29, 2016) (rejecting claim "based on the assumption that the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class violates the duty of prudence").

[12] The expense ratio of 0.53% is shown on page 4 and the "Annual Revenue Credit Rate" (i.e., the rebate that is "allocated to participants" invested in the fund) is shown on page 5 of participant fee disclosures. *See, e.g.*, Ex. I.

| JPM TDF 2020 R6[13] | .41% | None | .43% |
|---|---|---|---|

Ex. I. Other courts have rejected virtually identical claims about the same share class of the mutual funds at issue here (class R5 of the JPM TDFs), where, as here, the disclosures to Plan participants state that investors in the R5 share class received a revenue credit. For instance, in *Matney*, the court held that, "[t]aking into account the 15-basis-point revenue credit that Defendants negotiated for the JPMorgan funds' R5 share class, the Plan's expense ratio for each JPMorgan R5 fund was actually less than the R6 funds' expense ratios upon which Plaintiffs rely." 2022 WL 1186532, at *7. Here, the R5 share class was an even better deal for participants because Defendants negotiated a 20-basis-point revenue credit that Plan participants who invested in the JPM TDFs received. *See* December 2020 Notice of Investment Returns & Fee Comparison (Ex. I).

**Underperformance Claim:** Plaintiffs' claim that Defendants breached their duties because certain Plan investments allegedly underperformed benchmarks different than those in the funds' prospectuses by modest amounts over five-year or shorter periods fails on multiple levels.

First, the premise of this claim is faulty—five-years (or less) of alleged underperformance does not state a claim for breach of fiduciary duty. *See CommonSpirit*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision."). Second Circuit jurisprudence is clear that Plaintiffs must allege "ten-year underperformance" in order to possibly state a breach of fiduciary duty claim based on investment performance. *Northwell Health, Inc.*, 2022 WL 4639673, at *7 (quoting *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019)). That is because ERISA's fiduciary prudence test focuses on "a fiduciary's conduct in arriving at an investment decision, not on its

---

[13] The expense ratio of the "R6" share class is found on page 1 of the JPMorgan SmartRetirement 2020 Fund summary prospectus. *See* Ex. K.

results," and anything less than ten-years is deemed impermissible Monday-morning quarterbacking. *St. Vincent*, 712 F.3d at 716. Courts have therefore roundly rejected claims, like the one here, that an ERISA fiduciary breaches its duties because some plan investments underperformed over a five-year or shorter period. *See*, *e.g.*, *Northwell Health, Inc.*, 2022 WL 4639673, at *7 (three- and five-year underperformance insufficient to state a claim); *Patterson*, 2019 WL 4934834, at *11 (one-year underperformance measured over five different years insufficient to state a claim).

Second, not only must underperformance be long-term to plausibly suggest a fiduciary breach, it also must be "substantial." *Patterson*, 2019 WL 4934834, at *10. In *Northwell Health, Inc.*, for example, the court dismissed fiduciary breach claims based on "three- and five-year trailing averages" that showed underperformance ranging from 0.96% to 2.57% because that was "not the type of substantial underperformance over a lengthy period that gives rise to a plausible inference that a prudent fiduciary would have removed these funds from the plan's menu of options." 2022 WL 4639673, at *8. Here too, the three- and five-year performance of the challenged funds is within a few percentage points of the index and category averages. Compl. ¶ 68; *supra* at 11. This mix of outperformance and modest underperformance is nowhere near the level of underperformance necessary to state a fiduciary breach claim.

Third, Plaintiffs' claim fails because the performance data cited in the Complaint shows that the alleged investments did not consistently underperform. *See* Compl. ¶ 68; *Northwell Health, Inc.*, 2022 WL 4639673, at *7 (observing that "comparative underperformance must generally be consistent and substantial to support an inference of imprudence"). Rather, Plaintiffs' chart shows many years in which the challenged investments beat their category averages or indices. *Supra* at 10-11. The actual performance data is therefore fatal to Plaintiffs' claim. *See*, *e.g.*, *Ferguson*, 2019

WL 4466714, at *8–9 (dismissing ERISA breach of fiduciary duty claim where "[t]he relevant performance data demonstrates that the funds challenged in the SAC did not 'consistently underperform' benchmarks, but rather had periods of both outperformance and underperformance common amongst portfolio of investments").

Fourth, the contention that the JPM TDFs did not outperform their "counterparts" from Fidelity, American Fund, T. Rowe Price, and Vanguard fails to salvage this claim. Compl. ¶ 77. This allegation, too, looks only at a five-year period, shows performance within a few percentage points of the comparator funds, and shows mixed performance (with the JPM TDFs sometimes being above the 50th percentile, sometimes below). Furthermore, Plaintiffs make no effort whatsoever to plausibly demonstrate that the target date funds offered by Fidelity, American Fund, T. Rowe Price, and Vanguard (identified vaguely in Compl. ¶ 83) are a meaningful benchmark for the JPM TDFs, and other courts have rejected the same purported comparison. In *Rosenkranz*, for example, the court dismissed underperformance claims based on the same JPM TDFs because the "actively-managed American Funds and passively-managed Fidelity Funds identified in the complaint are not meaningful benchmarks for the blended JPM Retirement Funds." 2021 WL 5868960, at *10. Plaintiffs here use those same comparators, but allege nothing about whether they are blended funds like the JPM TDFs or employ a similar "glide path" to the JPM TDFs, a key distinguishing feature between target date fund offerings. *Rosenkranz*, 2021 WL 5868960, at *11 (rejecting proffered comparisons where "Plaintiffs failed to allege any information regarding the glide path" of the comparator funds).

Lacking meaningful benchmarks or allegations of ten-year, consistent, and substantial underperformance, Plaintiffs' hindsight-based claim that Defendants failed to monitor the Plan's investments must be dismissed.

**D.**    **Plaintiffs Fail to State a Claim Under Any of Their Alternative Legal Theories**

First, Plaintiffs' breach of the duty of loyalty claim fails because Plaintiffs essentially "recast purported breaches of the duty of prudence as disloyal acts." Compl. ¶¶ 28, 45, 85; *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017); *see also Cunningham*, 2022 WL 889164, at *6 ("because Plaintiff essentially recasts purported breaches of the duty of prudence as disloyal acts, she fails to sufficiently state a claim for breach of the duty of loyalty").

Second, Plaintiffs fail to plead a breach of the duty to monitor (Count II). Because "[a] claim for breach of the duty to monitor requires an antecedent breach to be viable," *In re Bear Stearns Cos.*, 763 F. Supp. 2d 423, 580 (S.D.N.Y. 2011), and Plaintiff fails to sufficiently state a claim that Defendants breached their duties, Plaintiffs' claim for failure to monitor also fails. *See, e.g.*, *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 368 (2d Cir. 2014) ("Plaintiffs' latter two claims—failure to monitor and breach of co-fiduciary duty—constitute derivative claims that cannot survive absent a viable claim for breach of a duty of prudence."); *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 764 (S.D.N.Y. 2015) ("The duty to monitor claim against Fuld fails because the TCAC fails to allege plausibly any primary breach of fiduciary duty on the part of the Plan Committee Defendants.").

Finally, Plaintiffs' knowing breach of trust claim (Count III) likewise "cannot survive absent a viable claim for breach of a duty of prudence." *Northwell Health, Inc.*, 2022 WL 4639673, at *12 (dismissing "knowing breach of trust" claim because breach of fiduciary duty claim did not survive). Just as in *Northwell Health, Inc.*, because Plaintiffs' "fiduciary-breach claims" should be dismissed, so too must the "knowing-breach-of-trust" claim be dismissed. *Id.*[14]

---

[14] In a single boilerplate paragraph, Plaintiffs assert that Defendants breached their duties because they "failed to fully disclose the expenses and risk of the Plan's investment options to participants and beneficiaries." Compl. ¶ 6. This claim fails because there are no supporting factual allegations. For example,

E.    **Claims Against the Board and Committee Defendants Should Be Dismissed Because They Are Not "Persons" Under ERISA**

Plaintiffs have asserted their ERISA fiduciary breach claims against the Board and Committee Defendants, but Plaintiffs never allege facts establishing that the Board and Committee Defendants are "persons" under ERISA, let alone that they had any role with respect to the Plan's investments to render them fiduciaries with respect to the challenged conduct.

ERISA makes liable "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" by ERISA. 29 U.S.C. § 1109(a) (emphasis added). ERISA defines a "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." *Id.* § 1002(9).

Neither a corporate board nor its subcommittees fit within the statutory definition of "person." The statute references formal business organizations and individuals, not corporate decision-making bodies like a board or board committee. As courts have acknowledged, reading ERISA's definition to exclude administrative committees from the list of parties capable of being sued "comports not only with the clear language of ERISA, but [also] common sense." *David v. Alphin*, 2008 WL 5244483, at *9 (W.D.N.C. July 22, 2008); *see also In re RCN Litig.*, 2006 WL 753149, at *5 (D.N.J. Mar. 21, 2006) (holding that a committee was not a proper defendant under ERISA because it "is not, by itself, a legal entity having the capacity to sue or be sued").

## CONCLUSION

For all the above reasons, Defendants respectfully request that the Court dismiss Plaintiffs' complaint with prejudice.

---

Plaintiffs never identify what "expenses and risk" were supposedly not disclosed to Plan participants, or where such disclosure obligation would arise in the first instance.

Dated: December 12, 2022                    Respectfully submitted,

                                            **MORGAN, LEWIS & BOCKIUS LLP**

                                            _/s/   Melissa D. Hill_

                                            Melissa D. Hill
                                            101 Park Avenue
                                            New York, NY 10178-0060
                                            Tel: (212) 309-6000
                                            melissa.hill@morganlewis.com

                                            _Attorney for Defendants_