## In the United States District Court for
## the Southern District of New York

| | |
|---|---|
| Shawyne Harris, Robert Taylor, and Sidney Dasent, individually and as representatives of a class similarly situated persons, on behalf of the Swiss Re Group U.S. Employee's Savings Investment Plan, | |
| *Plaintiffs,* | Case No. 1:22-cv-07059-ALC |
| v. | The Honorable Judge Andrew L. Carter Magistrate Judge Stewart D. Aaron |
| Swiss Re American Holding Corporation, the Board of Directors of the Swiss Re American Holding Corporation, the Swiss Re American Holding Corporation Governance & Nomination Committee, the Swiss Re American Holding Corporation Audit Committee, the Swiss Re American Holding Corporation Compensation Committee, the Swiss Re American Holding Corporation Finance & Risk Committee, the Swiss Re American Holding Corporation Investment Committee, and Does No. 1-30, whose names are currently unknown, | **Oral Argument Requested** |
| *Defendants.* | |

## Plaintiffs' Memorandum in Opposition to Defendants'
## Motion to Dismiss the Complaint

# CONTENTS

Contents ......................................................................................................... ii

Authorities .................................................................................................... iv

Preliminary Statement ................................................................................... 1

Background ...................................................................................................... 2

    1.    The Parties. ...................................................................................... 2

    2.    The Plan participants paid four times more for recordkeeping fees than participants of other defined contribution plans paid................................. 3

    3.    The Plan chose and retained investment funds with unreasonably high expense ratios. ................................................................................... 4

    4.    The Plans' investment options consistently underperformed relative to their respective comparators and benchmarks. ............................. 5

    5.    There is no statistical evidence that the Defendants used proper methodologies, like Modern Portfolio Theory, to review, select, and maintain the Plan's investment options. ...................................... 6

Argument ........................................................................................................ 7

    1.    Standard of review on a motion to dismiss.................................... 7

    2.    The Defendants' duty of care........................................................ 8

    3.    The Plaintiffs paid at least 375% more in RK&A fees than participants of other plans for the same services.................................................. 8

    4.    The Defendants imprudently selected the investment options available to the Plan participants. ................................................................ 12

        4.1    The documents required to be disclosed under ERISA do not enable plan participants to gauge a plan fiduciary's methodologies. ............. 12

        4.2    The Complaint relies on adequate statistics and benchmarks with which to compare the performance of the Plan's funds. ...................... 15

        4.3    The Defendants selected funds that carried expense ratios that were much higher than readily available, equal alternatives...................... 17

4.4   Nothing suggests that the Defendants relied on Modern Portfolio Theory or any other prudent investment evaluation tool when selecting, monitoring, and removing the Plan's investment options. .. 18

5.   The Complaint adequately alleges claims for breaches of the duty to monitor, and for the Defendants' knowing breaches of trust. ................... 21

6.   The Board and Committees are fiduciaries under ERISA. ........................ 23

7.   The Court should grant the Plaintiffs leave to file an amended complaint if it finds any of their claims deficient. ....................................................... 23

Conclusion ................................................................................................................... 24

# AUTHORITIES

**Cases**

*Albert v. Oshkosh Corp.*, 2021 WL 3932029 (E.D. Wis. Sept. 2, 2021) ...................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................................. 7

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ......................... 7, 12, 22

*Chill v. Calamos Advisors LLC*, 175 F. Supp.3d 126 (S.D.N.Y. 2016) ...................... 17

*Crowley ex rel. Corning, Inc, Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222
   (W.D.N.Y. Dec. 9, 2002) ........................................................................................... 23

*Cunningham v. Cornell Univ.*, 2019 WL 4735876 (S.D.N.Y. 2019)................ 6, 18, 20

*David v. Alphin*, 2008 WL 5244483 (W.D.N.C. July 22, 2008).................................. 22

*DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547 (S.D.N.Y. 2018) ................. 23, 24

*Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)....................................... 1, 18

*Foman v. Davis*, 371 U.S. 178 (1962)............................................................................ 23

*Gonzalez v. Northwell Health, Inc.*, 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022) .. 19,
   22

*Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18 (2d Cir.
   2002) ............................................................................................................................ 23

*Hughes v. Northwestern Univ.*, 142 S. Ct. 73 (2022) .................................................. 18

*In re Am. Intern. Group, Inc. ERISA Litig. II*, 2011 WL 1226459 (S.D.N.Y. Mar. 31,
   2011) ............................................................................................................................ 21

*In re Bank of America Corp.*, 756 F. Supp. 2d 330 (S.D.N.Y. Aug. 27, 2010)............ 23

*In re Beacon Assoc. Litig.*, 818 F. Supp. 2d 697 (S.D.N.Y. Sept. 26, 2011)............... 23

*In re Bear Stearns Companies,* 763 F.Supp.2d 42 (S.D.N.Y. Jan. 19, 2011) ............. 23

*In re Citigroup ERISA Litigation*, 104 F.Supp.3d 599 (S.D.N.Y. May 13, 2015)...... 23

*In re Citigroup ERISA Litigation,* WL 2762708 (S.D.N.Y. Aug. 31, 2009)............... 23

*In re MedStar ERISA Litig.*, Civil Action No. RDB-20-1984 (D. Md. Feb. 4, 2021) . 21

*In re Morgan Stanley ERISA Litig.*, 696 F Supp 2d 345 (S.D.N.Y. 2009) ................ 21

*In re Omnicom ERISA Litig.*, 2021 WL 3292487 (S.D.N.Y. 2021) ............... 16, 19, 22

*In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274 (D.N.J. May 4, 2021) . 9

*Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F.3d
    765 (5th Cir. 1999) ..................................................... 23

*Nicolas v. Trustees of Princeton Univ.*, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) .. 17

*Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293 ................................. 21

*Sacerdote v. New York University*, 7 F.4th 9 (2021) .......................... passim

*Silva v. Evonik Corp.*, 2020 WL 12574912 (D.N.J. Dec. 30, 2020) ........................ 16

*St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Mgmt.
    Inc.*, 712 F.3d 705 (2d Cir. 2013) ..................................... 12, 16

*Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863 (5th Cir. 2000) .......................... 23

*Tibble v. Edison Int'l*, 575 U.S. 523 (2015) .................................... 1, 6, 8, 18

*Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561 (2d
    Cir. 2016) .......................................................... 17

*Vellali v. Yale Univ.*, 3:16-cv-1345(AWT) (D. Conn. Oct. 21, 2022) .......................... 17

**Statutes**

29 U.S.C. § 1104(a) ..................................................................... 1, 8

Fed. R. Civ. P. 15(a)(2) ................................................................. 23

## PRELIMINARY STATEMENT

Plaintiffs Shawyne Harris, Robert Taylor, and Sidney Dasent, individually and as representatives of a of class similarly situated persons, on behalf of the Swiss Re Group U.S. Employee's Savings Investment Plan (the "Plan"), submit this memorandum of law in opposition to the Defendants' motion to dismiss the complaint.

Defined Contribution Plans, such as 401(k) plans, have become the primary form of retirement savings in the United States, and can be considered our country's *de facto* retirement system. Compl. ¶ 2. The participants—not their employers— bear the risk of high fees and the underperformance of their investments. *Id.* at ¶ 2. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Id.*at ¶ 29; *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 25% difference in retirement assets at the end of a participant's career. *Id.* at ¶ 30 (*citing A Look at 401(k) Plan Fees*, U.S. Dept. of Labor at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (accessed August 17, 2022)).

To protect plan participants, the Employee Income Retirement Security Act ("ERISA") therefore imposes a high standard upon fiduciaries responsible for managing 401(k) plans. Fiduciaries must act for the sole purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering their plans. 29 U.S.C. § 1104(a)(1)(A)(i)-(ii). These duties are among the highest known to law and must be "made with an eye single to the interest of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

The Defendants failed to adhere to ERISA's basic principles, using flawed methodologies that lead to a poor outcome; they chose expensive, underperforming

investment options instead of lower-cost and better alternatives, and by charging the Plaintiffs grossly excessive recordkeeping fees. They consequently have breached their fiduciary duties to the Plaintiffs, who have been damaged in excess of $4,000,000. In asking the Court to dismiss this action, the Defendants ignore or fail to: (1) accept as true many of the Plaintiffs' allegations; (2) opine on their investment methodologies; (3) examine their actions in the aggregate; (4) provide the Court with a complete understanding of how recordkeeping and revenue sharing models work; and (5) downplay their heightened duty of care and the standard applicable to motions to dismiss.

The Defendants' use of hyperbole, insults, and inapplicable analogies serve only to misdirect the Court's attention or to mask their lack of understanding of defined contribution plan fees. Rather than fall prey to their mudslinging, the Plaintiffs will validate their Complaint and elucidate purported unclarities.

## BACKGROUND

### 1.    The Parties.

The Plaintiffs are former employees of Swiss Re. Compl. ¶¶ 9-11. For the six years prior to the Plaintiffs' filing of their Complaint and continuing to date (the "Class Period"), the Plaintiffs and the class they represent maintained investments through the Swiss Re Group US Employees' Savings Plan (the "Plan"), a defined contribution plan subject to ERISA. *Id.* at ¶¶ 9-11, 24.

Swiss Re, its board of directors, the committees named as defendants, and the unnamed defendants who are fiduciaries of the Plan under ERISA (collectively, the "Defendants"), maintain the Plan. *Id.* at ¶¶ 5, 12-20. The Defendants retained Great-West Trust Company LLC to be the Plan's Trustee, and Great-West Financial Retirement Plan Services, LLC (the "Recordkeeper") to provide recordkeeping and other services to the Plan. *Id.* at 24. The Recordkeeper maintains records of the

2

Plan's participants, effectuates the investment elections of the Plan's participants, and performs administrative functions, such as loan processing and withdrawal requests, for the Plan's participants. *Id.* at ¶ 26.

**2.    The Plan participants paid four times more for recordkeeping fees than participants of other defined contribution plans paid.**

Generally, recordkeepers provide administrative services, including call center support; investment education and guidance; providing participant communications; and providing trust and custodial services, in addition to their recordkeeping duties (the recordkeeping and non-recordkeeping services are referred to as "RK&A fees"). *Id.* at ¶ 32. Recordkeepers are typically paid either: (1) directly from plan assets, which is reflected as a deduction in the value of the participants' accounts ("direct compensation"); or (2) through investment options prior to the value of the investment option being provided to the participant, which most often comes from the investment's "expense ratio" in the form of revenue sharing payments that are collected by the investment provider and remitted to the recordkeeper ("indirect compensation"). *Id.* at ¶¶ 34-36. Slight differences in how recordkeeping services are delivered makes no material difference on fees for plans with over 4,000 participants. *Id.* at ¶ 38.[1] However, when more participants maintain an account balance in a defined contribution plan, recordkeepers are willing to negotiate lower service fees[2]. *Id.* at ¶ 39. Informed, prudent plan fiduciaries understand these cost dynamics and will leverage them to obtain lower recordkeeping fees. *Id.* at ¶ 42, 44.

---

[1] The Plaintiffs alleged that the Plan's RK&A services are the same services provided to other plans. Compl. ¶ 47. The Defendants' argument that the complaint fails to allege that other plans provided the same services is therefore false.

[2] Additionally, it is common knowledge that recordkeepers prefer working with plans such as Swiss Re's where the average participant balances are high, indicating account longevity.

Holding over one billion dollars in assets and having over four thousand participants with account balances as of August 6, 2021, the Plan is in the top 0.1% of all defined contribution plans by plan size in the United States. *Id.* at ¶ 4. That gives its fiduciaries significant bargaining power when it comes to negotiating fees for, for example, administrative and investment management services. *Id.*

The Defendants nevertheless failed to seek competitive bids for RK&A fees. Instead, they allowed the Plan to incur fees far above the reasonable market rate during the Class Period. The average 401(k) recordkeeping cost is between $34 and $63 per participant, but the Plan charged between $163 and $282 per participant— approximately 400% more than the average. *Id.* at ¶¶ 48-53. An analysis of the Forms 5500 of similarly sized plans paid much lower fees, demonstrating that their fiduciaries properly discharged their duties by negotiating reasonable fees based on the size of their plans. *Id.* at ¶ 57. Because the Defendants failed to obtain lower, reasonable RK&A fees, the Plaintiffs and the class they represent have been damaged in an amount exceeding $4,000,000 in excessive RK&A fees alone. *Id.* at ¶ 51.

### 3. The Plan chose and retained investment funds with unreasonably high expense ratios.

Since 2018, the Plan has held over $1,000,000,000 in assets. *Id.* at ¶ 60. The Defendants selected 12 investments that charged at least the median expense ratio cost for plans holding that amount of assets or more. *Id.* at ¶¶ 60-61. The investments also were equal to or worse than the median percentile for that data range. *Id.*

In addition, the Defendants selected JPMorgan ("JPM") Target Date Class R5 funds as their target date fund ("TDF") options. *Id.* at ¶ 62. However, since late 2014, the R5 class has had an expense ratio that is greater than its R6 counterpart;

from 2015 through 2020, that represents an estimated $1,038,740 of lost returns for the Plan participants *Id.* at ¶¶ 62-64. Due to the Defendants' poor methodology in selecting the JPM TDFs, Plan participants have lost significant growth in their retirement assets, *Id.* at ¶ 66, which decreases the likelihood that plan participants reach their expected lifestyle in retirement.

The Defendants also failed to consider selecting better and more consistent TDFs than those offered by JPMorgan. *Id.* at ¶ 67. Had the Defendants acted solely in the best interest of the Plan participants and weighed the benefits of the JPM TDFs against the available alternatives, they would have concluded that the JPMorgan options were far inferior and therefore an imprudent offering in the Plan's lineup of investment choices. *Id.* at ¶ 67. This evidences a poor investment methodology.

**4.    The Plans' investment options consistently underperformed relative to their respective comparators and benchmarks.**

Fiduciaries must gauge the performance of the investment options in their defined contribution plan to determine whether they are keeping up with other options in their peer groups. *Id.* at ¶ 68. One appropriate measurement is the "quartile rank," which measures how well an investment has performed against others in its category. *Id.*

As of March 31, 2022, at least eight of the Plan's TDFs[3] (into which approximately 31% to 34% of the Plan's assets were invested) and two of its non-TDF options performed poorly against their competitors. *Id.* at ¶ 69, 71, 75. Many of the JPM TDFs consistently and substantially underperformed their competitors, and only beat their S&P benchmark twice out of 21 times. *Id.* at ¶ 72, 77. In

---

[3] The suite of JPM TDFs is the Plan's Qualified Default Investment Alternative ("QDIA"). Compl. ¶ 70.

addition, the R5 TDFs did not outperform their Fidelity, American Fund, T. Rowe Price, and Vanguard counterparts a single time. *Id.* at ¶ 77.

A viable review process is part of a plan sponsor's fiduciary duty, as it is prudent and reasonable to have one. *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *11 (S.D.N.Y. 2019)(*citing Tibble*, 135 S. Ct. at 1829)). Given the continued presence of the JPM TDFs in the investment option pool, it is apparent that the Defendants failed to scrutinize their performance against the performance of the competition. Consequently, the Plaintiffs have missed out on millions of dollars in retirement savings growth during the Class Period. Compl. ¶ 72. Moreover, even if the options were reasonable at some point, the fact that they so poorly performed during the Class Period shows that the Defendants failed to monitor them and replace them with more prudent options. *Id.* at ¶ 75. The Defendants had immediate access to the historical and then-current return data for the JPM TDFs but nevertheless failed to analyze them against appropriate peer data; had they done so, they would have removed the JPM TDFs and replaced them with prudent and reasonable alternatives.

5.  **There is no statistical evidence that the Defendants used proper methodologies, like Modern Portfolio Theory, to review, select, and maintain the Plan's investment options.**

ERISA fiduciaries must develop a method for selecting the investments for a defined contribution plan. *Id.* at ¶ 80. The tools of Modern Portfolio Theory ("MPT")[4] allow fiduciaries to investigate the merits of the investment options they select by examining: (i) sensitivity to the market's movements ("Beta"); (ii) statistical measurements of dispersion about an average ("Standard Deviation")[5]; (iii) the

---

[4] Utilizing MPT is not mandatory to fulfill fiduciary duties under ERISA. However, the Uniform Prudent Investment Act is the current standard related to characterizing prudence and expands on the prudent man concept. In its preamble, it validates MPT as an acceptable and "prudent" methodology because it examines investments while considering volatility and risk of returns.
[5] A high standard of deviation implies greater volatility. Compl. at ¶ 82(b).

correlation of an investment's return to the returns of its respective benchmark ("R Squared"); (iv) the standard deviation and excess returns of the investment ("Sharpe Ratio"); (v) whether the investment has gained more, or lost less, than a broad market benchmark during strong and weak markets ("Upside/Downside Capture Ratio"); and (vi) returns in excess of the benchmark's returns, compared to the volatility of those returns ("Information Ratio")[6]

As the Plan's fiduciaries, the Defendants are obligated to follow methodologies that consider risk and volatility when choosing and reviewing investments. *Id.* at ¶ 84. Nothing suggests that they followed MPT or any other prudent investment analysis. *Id.* at ¶ 81, 84. Indeed, the data reflects that the Defendants failed to monitor and replace the investment options, which were more expensive than the available alternatives and lagged far behind their comparators and respective benchmarks *Id.* at ¶ 84.

## ARGUMENT

### 1.   Standard of review on a motion to dismiss.

A complaint will survive a motion to dismiss if it contains sufficiently factual allegations that state a claim of relief that is plausible on its face. *Sacerdote v. New York University*, 7 F.4th 95, 106 (2021)(*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts must construe the allegations liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-107 (citations omitted). In addition, a complaint should be read as a whole, "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

---

[6] This measures an investment manager's ability to generate returns that exceed the benchmark's returns and attempts to measure the manager's consistency over time. Compl. at ¶ 82(f) n.9.

Because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," a claim "may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *Id.* at 107 (quotations and citations omitted).

## 2.    The Defendants' duty of care.

In acting for the sole purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering their plans, 29 U.S.C. § 1104(a)(1)(A)(i)-(ii), ERISA fiduciaries must discharge their duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Sacerdote*, 9 F.4th at 107. The standard applies not only to the selection of investment options, but also the monitoring and, if necessary, removal of them. *Tibble*, 575 U.S. at 529. It focuses on the fiduciary's conduct in arriving at an investment decision and asks whether the fiduciary "employed the appropriate methods to investigate and determine the merits of a particular investment. *Id.* (citations omitted).

## 3.    The Plaintiffs paid at least 375% more in RK&A fees than participants of other plans for the same services.

The Defendants argue that, in 2020, Plan participants paid approximately $40 per year to Great-West for recordkeeping fees. Memorandum of Law in Support of Swiss Re Defendants' Motion to Dismiss the Complaint ("Defs.' Memo") at 14. Based on that number, they conclude that "the fees the Plan paid are within the range of what Plaintiffs allege to be reasonable." *Id.* However, the Defendants ignore the definition of RK&A fees—services paid by the Plaintiffs for recordkeeping

and non-recordkeeping services, which are paid through direct and indirect compensation. Compl. at ¶¶ 32-36. Those fees include payments for accounting, legal, and trustee services necessary for administering the Plan. *A Look at 401(k) Plan Fees*, U.S. Dept. of Labor at 6 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (accessed August 17, 2022). The Complaint alleges that those RK&A fees were excessive. Compl. at ¶¶ 46-58. The Plaintiffs' allegations that the Defendants overpaid management fees, and that the Plan failed to use its size and negotiating power to reduce costs, are sufficient to survive a motion to dismiss. *In re Quest Diagnostics Inc. ERISA Litig.*, 2021 WL 1783274 (D.N.J. May 4, 2021).

While the Plaintiffs may have paid $40 per participant to Great-West, it also paid Advised Asset Group, LLC, JPMorgan Investment Management, NEPC LLC, PricewaterhouseCoopers LLP, Troutman Sanders LLP, Aon Consulting Inc., and GWFS Equities Inc. for the non-recordkeeping services that constitute the Plan's RK&A fees via direct compensation. Declaration of Melissa D. Hill ("Hill Decl.") at Exhibits 1 and 2. Those payments totaled $282.43 per participant in 2019 and $242.92 per participant in 2020. Thus, the Plaintiffs' "egregiously sloppy math and flawed premise," Defs.' Memo at 14, accurately reflect the Plan's RK&A fees, which are between 386% and 714% greater than RK&A fees paid by participants of other plans. Compl. at ¶ 52.

The Plan's 2020 Form 5500 was filed with the Department of Labor and included the Plan auditor's report. It provides:

> All administrative, trustee, and investment management expenses related to the operation of the Plan are paid from the Plan's assets, except those that are disallowed by the Department of Labor, which are paid by SRAH. **The Plan also maintains an ERISA spending account funded**

> **by administrative fees deducted from participants'
> accounts from which reasonable administrative fees
> of the Plan may be paid.** During the year ended
> December 31, 2020, the Plan paid $314,861 in Plan-related
> expenses from the ERISA Spending account. As of
> December 31, 2020 and 2019, the balance in the ERISA
> spending account is $579,520 and $435,451, respectively,
> which are included in total investments per the Statements
> of Net Assets Available for Benefits.

and

> Each participant's account is credited with the
> participant's contributions, the Companies' contributions,
> Plan earnings or losses (net of Plan expenses), and
> allocated forfeitures (when applicable). Participant
> accounts will also be charged with an allocation of
> administrative expenses. **The Plan shall credit all
> revenue sharing received by the Plan to the
> accounts of those participants who had a balance in
> the fund that paid the revenue sharing amount…**

Hill Decl. at Exhibit 2 (emphasis added).

By the Defendants' own disclosure to the government, the Plan did not credit participant accounts regularly, meaning it did not reimburse all the Plan participants with the credits—not even on an annual basis. The Defendants' motion to dismiss advises that the credits to participants are made at the discretion of the Plan Sponsor. Defs.' Memo at 10 n.7. Resultantly, it is impossible for plaintiffs to ascertain from which year(s) those amounts were carried over. What can be calculated is the amount that each participant could receive had the spending account balance been credited to all current balance holders. That is: $579,520/4060 (number of participants from 2020 5500) = $142.74.[7] If one adds that to the $41.41 per participant that they are claiming, per participant charge is $184.15.

---

[7] The $142.74 per participant was not paid as direct compensation to the recordkeeping and service provides, and it was not reimbursed to the Plaintiffs through revenue sharing. If one adds that

If one adds the unallocated assets to the Direct Compensation, or $142.74 + $242.92 (we will not include the $41.41 because the recordkeeper charges may also be included on the ledger), the per participant charge is $385.66.

Although the Plan states that it will credit all revenue sharing received by the Plan to the accounts of those participants who had a balance in the fund that paid the revenue sharing amount, the timing of those payments remain a mystery. Equally enigmatic are responses to the below questions that arise as a direct result of the Defendants' disclosures:

- o    When are credits visible to participants?

- o    From which years, and for how many years, are spending account balances carried over?

- o    how were the revenue sharing fees paid?[8]

- o    to whom (if at all) did the Defendants pay the unallocated balance in the next year?

- o    Did the Defendants use the unallocated funds to decrease future costs incurred by plan participants?

- o    How much in earnings would those monies create for plan participants, had they been returned to them or, better yet, not charged to them in the first place?

- o    How did the alleged credits satisfy excessive recordkeeping to former participants who left the Plan through employment or death?[9]

---

amount to the RK&A fees paid to the entities listed in the Form 5500 except Great-West (to avoid the risk of including fees to Great-West twice), the Plaintiffs paid $344.27 in 2020. In 2019, plan participants paid $348.04 for these allocated and unallocated RK&A fees. See Hill Decl. at Exhibit 2. Thus, plan participants actually paid over 800% more in RK&A fees than did participants of other plans. If that's not excessive, then nothing is.

[8] The three most common alternatives for the use of revenue sharing are: (1) the money is retained by the recordkeeper and used to pay its charges; (2) the money is used to pay the recordkeeper's cost, but any excess is deposited into the plan; and (3) the money is paid into the plan and allocated to participants. Fred Reish, *The Equitable Allocation of Revenue Sharing to Participants*, American Society of Pension Professionals & Actuaries, https://www.asppa.org/sites/asppa.org/files/The-Equitable-Allocation-of-Rev-Sharing%20%281%29.pdf (accessed January 13, 2023).

[9] In other words, does the Plan seek out former participants who are owed a credit? Likely not, as that is impractical. However, the conclusion is that unless the timing of these credits are perfect,

11

These questions will remain unanswered without discovery and no public disclosures address them. The Plaintiffs correctly allege that they paid excessive fees. Although the Defendants attempt to temper the sticker shock attendant with those fees with a credit, the information surrounding the credit is as clear as mud. Moreover, while the 5500 indicates there was no indirect compensation paid by the Plan, that is clearly false. The Plan's audited financials, attached to the Form 5500, state that more than $500,000 in indirect compensation remains in the Plan's expense account and is rolled over year to year. Hill Decl. at Exhibit 2. The Plaintiffs therefore are entitled to discovery and their claims should not be dismissed.

4.    **The Defendants imprudently selected the investment options available to the Plan participants.**

4.1    **The documents required to be disclosed under ERISA do not enable plan participants to gauge a plan fiduciary's methodologies.**

Details about a fiduciary's methods and actual knowledge regarding investment decisions tend to be in the fiduciary's sole possession[10]. *Sacerdote*, 9 F.4th at 107; *St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719-720 (2d Cir. 2013); *Braden*, 588 F.3d at 598 ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences"). ERISA imposes disclosure requirements on plan administrators,

---

Plan participants are paying excessive fees, at least to the extent that they are not credited with the excess. A colorable claim is therefore made, and dismissal is premature.

[10] Fiduciary duty is not characterized and defined well in common law, which is a reason ERISA was modeled, to some degree, after trust law. Trust law defines a fiduciary relationship as one not necessarily created by contract, but by duties owed in a relationship that is unbalanced. There is imbalance in subject matter sophistication between the Plan Sponsor and Plan participants that exposes participants to economic loss.

which are supposed to give plan beneficiaries "the opportunity to find out how the fiduciary invested the plan's assets." *St. Vincent*, 712 F.3d at 720.

The reality is that plan participants cannot rely on most of the required disclosures to determine whether a fiduciary has acted in accordance with its duty, which is one of the highest standards known to law. *Donovan*, 680 F.2d at 271. Below are the documents relevant to this matter that must be disclosed:[11]

- o   *Summary Plan Description (SPD)* – Informs participants of their rights, benefits, and obligations under the plan.

- o   *Summary of Material Modification (SMM)* – Describes any material modification to a plan and to the information required in the plan's SPD.

- o   *Summary Annual Report (SAR)* - Provides a "narrative summary" of the plan's annual Form 5500.

- o   *Notification of Benefit Determination* – Provides information regarding determinations of any benefit claim made by the participant.

- o   *Plan Document* – Upon request, the plan administrator must make the Plan available to the participant.

- o   *Notice of Blackout Period for Individual Account Plans* – Notice that a participant's account is temporarily suspended, limited, or restricted under an individual account plan.

- o   *Qualified Default Investment Alternative Notice* – Provides advance notice describing how contributions will be invested on the participant's behalf if no investment is otherwise selected.

- o   *Automatic Contribution Notice* – Informs participants of their rights and obligations related to an automatic contribution arrangement.

- o   *Annual Funding Notice*- Contains "basic information" about the status and financial condition of the plan.

- o   *Participant Plan and Investment Fee Disclosures* (for self-directed

---

[11] *Reporting and Disclosure Guide for Employee Benefit Plans*, U.S. Dept. of Labor (Sept. 2017), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/reporting-and-disclosure-guide-for-employee-benefit-plans.pdf (accessed Jan. 13, 2023); *Retirement Plans Reporting and Disclosure Requirements*, Internal Revenue Service (https://www.irs.gov/pub/irs-pdf/p5411.pdf) (accessed Jan. 13, 2023).

plans)– inapplicable to individuals invested in the QDIA.

o *Form 5500* – Provides aggregate information on a plan's qualification, financial condition, and operation.

o *Form 5588*– Application for extension of time to file Form 5500.

o *Form 1099-R*– Reports participant distributions of $10 or more.

o *Notice of Effective Opportunity to Make or Change Cash or Deferred Election* – Advises plan participants of the opportunity to make or change a salary deferral election.

o *401(k) Safe Harbor Notice* – Advises eligible employees of their rights and obligations under the plan, including safe harbor information.

o *Qualified Automatic Contribution Arrangement (QACA) Notice* – Advises eligible employees of their rights and obligations related to qualified automatic contribution arrangements.

o *Eligible Automatic Contribution Arrangement (EACA) Notice* - Advises eligible employees of their rights and obligations related to eligible automatic contribution arrangements.

o *Interested Party Notice* – Notifies participants if the plan pays or otherwise benefits an interested party (as defined under ERISA).

o *401(k) Safe Harbor Discontinuance Notice* – Notifies eligible employees of the consequences of an amendment during a plan year that reduces or suspends safe harbor matching contributions.

o *Updated Notice for Mid-Year Changes to Safe Harbor Plans or Safe Harbor Notices* – Provides and updated safe harbor notice that describes a mid-year change and its effective date.

o *Eligible Rollover Distribution Notice (§ 402(f) Notice)* – Describes the tax treatment and withholding rules related to rollover distributions.

o *Explanation of Income Tax Withholding Requirements* – Informs participants that the need not have federal income tax withheld from their distributions.

o *Explanation of Automatic Rollover* – Provides notice that, absence affirmative action by the participant, the participant's payments will automatically be rolled over to an IRA.

o *Consent to Distribution Explanation* – Obtains the participant's consent to a distribution over $5,000.

o    *Notice of Right to Diversify Investments in Employer Securities* – Provides applicable individuals with the right to divest employer securities in their account and reinvest those amounts in certain diversified investments.

o    *Domestic Relations Order and Qualified Domestic Relations Order Notices* – Notifies the participant of the plan's procedure for determining the qualified status of a domestic relations order.

o    *Notice of Suspension of Benefit Upon Reemployment of Retiree* – Explains why a participant's benefits payments are being suspended.

o    *Plan Service Provider Disclosures* (provided to plan fiduciaries)- Provides detailed information "about the compensation, both direct and indirect, that [the plan service providers] will receive for providing services to pension plans."

Although caselaw suggests that these disclosures provide would-be plaintiffs with sufficient information to determine fees, credits, forfeitures, and investment theories, they do not. It is likely that the only document that does provide the pertinent information is the plan service provider agreement, which is not disclosed to plan participants outside of litigation, and even then, likely under the cloak of a confidentiality agreement.

**4.2    The Complaint relies on adequate statistics and benchmarks with which to compare the performance of the Plan's funds.**

The Complaint's reliance on the 2018 Brightscope/ICI Report to compare the expense ratios of numerous funds is proper. The Defendants argue that the Report cannot be used for benchmarking purposes. Hill Decl. at Exhibit 6. However, the Plaintiffs included the Report only to provide essential background information, namely, the expense ratios of funds commonly included in defined contribution plans. If they did not include it, the Court would have no way to tell whether the JPM TDFs carry high or low expense ratios.

The Report shows that the Plan's funds charged as much as 184% more than the funds in other plans. Compl. ¶ 60. Had the Defendants carried out their

fiduciary duties and used prudent methodologies for selecting the Plan's funds, the Plaintiffs would have paid expense ratios that were at or below the median costs reflected in the Brightscope/ICI Report. *Id.* at ¶¶ 65-67. Their failure to do so indicates that the Defendants failed to perform their duties solely in the interests of the Plan participants. *Id.* at ¶ 67.

The benchmarks and comparators used with respect to fund performance are also proper. All of the funds cited by the Plaintiffs use the Morningstar Lifetime Moderate 2030 index fund as a benchmark and are classified under the same fund category. Exhibit 1 at PDF pages 7, 8, 10-13, 21, 26, 33, 37, 43. Thus, Plaintiffs have given the Court an opportunity to make an apples-to-apples comparison of each fund's performance.

The Plaintiffs challenge the Defendants' methods in choosing the JPM TDFs, which were more expensive and performed worse than other comparable, readily available funds when comparing them to the Morningstar benchmark. Compl. ¶¶ 68-79. That is all that is required to survive a motion to dismiss. *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *16 (S.D.N.Y. 2021)(stating that a plaintiff need only allege that fees were excessive in comparison to similar funds, and denying motion to dismiss where the plaintiffs identified funds that tracked benchmark with lower expense ratios). As explained in § 4.4, *infra* pp. 18-20, the underperformance of the TDFs over at least a 7-year period has resulted in significant annualized losses for the Plan participants and plausibly suggests that the Defendants failed to carry out their fiduciary duties with respect to selecting, monitoring, and reviewing the Plan's investment options. Given that the details about a fiduciary's methods about investment decisions tend to be in the fiduciary's sole possession, *St. Vincent*, 712 F.3d at 719-720, these allegations are sufficient to survive a motion to dismiss.

In any event, whether the Plaintiffs have selected apt comparators is a question of fact that is unsuitable for resolution on a motion to dismiss. *Silva v.*

*Evonik Corp.*, 2020 WL 12574912, *6 (D.N.J. Dec. 30, 2020)(*quoting Nicolas v. Trustees of Princeton Univ.*, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017)); *see Chill v. Calamos Advisors LLC*, 175 F. Supp.3d 126, 138 (S.D.N.Y. 2016). This Court therefore should reject the Defendants' argument and allow this case to proceed to discovery.

### 4.3    The Defendants selected funds that carried expense ratios that were much higher than readily available, equal alternatives.

Expense ratios measure how much of a fund's assets are used for administrative and other operating expenses. *Expense Ratio*, Investopedia (Sept. 12, 2022), https://www.investopedia.com/terms/e/expenseratio.asp (accessed Jan. 13, 2023). Because expense ratios reduce the fund's assets, they reduce the overall return to investors. *Id.*

The Defendant selected a suite of JPM SmartRetirement® R5 share class TDFs as their QDIA option, rather than its R6 counterpart, which has a lower expense ratio. Compl. ¶ 62. Since November 2014—the earliest date assets could invest in the R6 share class—the R6 shares have carried a lower expense ratio. *Id.* at 63. Thus, the Defendants' retention of the R5 class has cost the Plaintiffs significant growth in their retirement assets since that date.

Loss is measured in this context by a comparison of what a plan actually earned on the investment with what it would have earned had the funds been available for its other purposes. *Vellali v. Yale Univ.*, 3:16-cv-1345(AWT), at *39-40 (D. Conn. Oct. 21, 2022)(*citing Sacerdote*, 9 F.4th at 112 (internal quotations and citations omitted). If the latter amount is greater than the former, the loss is the difference between the two." *Id.* "If, but for the breach, the [Plan] would have earned even more than it actually earned, there is a loss for which the breaching fiduciary is liable." *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset*

17

*Mgmt.*,843 F.3d 561, 567 (2d Cir. 2016)(internal quotations and citation omitted). "Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*,843 F.3d at 1198 (internal quotations and citations omitted). "Where alternative strategies are possible, courts 'presume that the funds would have been used in the most profitable of these.'" *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *6 (*quoting Donovan*,754 F.2d at 1056).

The Defendants were responsible for monitoring the Plan's investment options. Compl. ¶ 66. They should have chosen TDFs that performed better after all costs, including expense ratios, were considered. Had they switched to the R6 share class, the Plaintiffs would have reaped the benefits of higher returns, especially when factoring the effect of compounding. However, because they do not employ proper methods for determining which funds to keep and which to remove, they failed to do so and consequently breached their fiduciary duties.

The Defendants argue that the R5 class is actually cheaper because of its revenue credit. However, as discussed in § 4.2 (*supra* at 8-12), that argument fails— whether Plan participants received the benefit of any revenue credit is a question that can only be answered through discovery. Because we are not yet at that stage, the argument is premature.

### 4.4   Nothing suggests that the Defendants relied on Modern Portfolio Theory or any other prudent investment evaluation tool when selecting, monitoring, and removing the Plan's investment options.

Fiduciaries have a continuing duty to monitor and review plan investments, and to remove imprudent options. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022)(*quoting Tibble*, 575 U.S. at 530). At the pleading stage, courts must only

18

determine whether the complaint adequately alleges that a plan's fiduciary engaged in an imprudent monitoring process during the relevant class period to determine the merits of an investment. *Albert v. Oshkosh Corp.*, 2021 WL 3932029, *4 (E.D. Wis. Sept. 2, 2021). The Plaintiffs alleged that, when reviewing the real-time information available to fiduciaries for each year of the Class Period, a prudent fiduciary would have removed and replaced the JPM TDFs offered through the Plan. Compl. ¶ 73. Those funds consistently underperformed relative to their respective benchmarks and appropriate, readily available alternative suites of TDFs. *Id.* ¶¶ 69, 72, 77.

The Defendants have raised questions of fact before the Court, namely, whether the comparators used by the Plaintiffs are adequate. Issues of fact are inappropriate to resolve on a motion to dismiss. *Omnicom*, 2021 WL 3292487, at *14. Notwithstanding, the Complaint identifies appropriately similar funds and for an appropriate period of time. The Defendants' reliance on *Gonzalez v. Northwell Health, Inc.*, 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022) is misguided. That court states that 3- and 5-year trailing returns are insufficient but does not opine on a 7-year period,[12] which is what the Complaint reflects. In addition, the same comparators can be compared to the JPM TDFs over a 10-year period because the funds have existed for at least 10 years. The quarters compared are cumulative, not in isolation, and because the 1-, 3- and 5-year data reflect trailing returns, they look backwards[13] and appropriately reflect the most current cycles of fund performance. *See Omnicom*, 2021 WL 3292487 (denying motion to dismiss where plaintiffs compared performance of two suites of TDFs on a trailing 3- and 5-year annualized

---

[12] The suggested comparators may reflect more than 10 years of data, as the 5-year trailing return for the 1st quarter of 2015 looks back to 2010 and forward to the first quarter of 2022 evidence a performance history from 2010-2021, or a period of more than 11 years.

[13] *Trailing Returns*, Morningstar, https://www.morningstar.com/invglossary/trailing-returns.aspx (accessed Jan. 13, 2023).

basis)). Moreover, to the extent the Defendants contend that a 10-year period is correct, the argument raises questions of fact that should not be resolved on a motion to dismiss. *Cunningham*, 2017 WL 4358769 at *7.

The Defendants attempt to couch Plan returns as reasonable because the Plan's investment funds performed adequately some of the time and, alternatively, that when the Plan's funds underperformed, the underperformance was nominal. Defs.' Memo at 21-23. However, their argument fails because it neglects to consider the annualized effect of the losses. The annualized return should be used because the amount of investment lost or gained in a given year is interdependent with the amount from the other years under consideration because of compounding. As such, if there is a 1% delta between two funds, the fund that is underperforming needs to yield 1% more than its counterpart the following year in order for its investor to break even. a 1% difference can affect a balance as much as 25%. S*ee supra* at 1. The Defendants argue that the Plan's funds performed within 2.6% and 1.2% of the index. Assuming 1% of $469,200,000[14] dollars is $4,692,000, that's approximately $1,155 per participant per year. If a participant reinvested that entire amount, compounded annually at 1% interest over 10 years, they would have a balance of over $13,000. If the Plan reinvested the $1,155 for each participant, it would have a balance of at least $52 million over that period, which is not insignificant.

The failure of the Defendants to monitor and replace the underperforming funds indicates that they did not use the tools of MPT to make prudent investment decisions. As such, their methodology (if one existed) was impermissibly flawed, and the Defendants have breached their fiduciary duties of prudence to the Plaintiffs.

---

[14] The Complaint alleges that the Plan held $1.38 billion in assets, and that between 31%-34% of those assets were invested in the JPM TDFs. Compl. ¶¶ 4, 71. $469,200,000 is 34% of $1.38 billion.

5.      **The Complaint adequately alleges claims for breaches of the duty to monitor, and for the Defendants' knowing breaches of trust.**

   5.1      **The Plaintiffs have adequately alleged their claim for breach of the duty to monitor.**

A Complaint  states a claim for breach of the duty to monitor when it alleges that fiduciaries: (1) failed to act upon warning signs that warranted an investigation into the prudence of maintaining an investment option, or (2) failed to establish a procedure for monitoring appointed fiduciaries. *In re Am. Intern. Group, Inc. ERISA Litig. II*, 2011 WL 1226459 at *10 (S.D.N.Y. Mar. 31, 2011).

As addressed in this memorandum (*supra* at 18-20), the Complaint alleges that the Defendants failed to investigate the prudence of keeping the JPM TDFs in the Plan, despite the data showing the funds were more expensive and worse performing than readily available alternatives. In addition, the Complaint alleges that Swiss Re appointed the Board, and that it and the Board failed to monitor the Committees' actions regarding the Plan. Compl. ¶¶ 5, 14-20,  58, 109-117. Those failures resulted in significant losses  for the Plaintiffs. The Complaint therefore sufficiently alleges a breach of the duty to monitor.

Moreover, because the Plaintiffs alleged a plausible claim that Defendants breached their fiduciary duties, they have sufficiently alleged a breach of the duty to monitor. *In re MedStar ERISA Litig.*, Civil Action No. RDB-20-1984 at *15 (D. Md. Feb. 4, 2021); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d at 1308 ("Because plaintiffs have sufficiently stated a claim for breach of fiduciary duty, the court finds that plaintiffs have also sufficiently pleaded the failure to monitor claim"); *Am. Intern. Group II*, 2011 WL 12264559 at *10 ("Here, Plaintiffs' pleading is sufficient, alleging as it does that the monitoring Defendants 'failed to monitor their appointees, to evaluate their performance, or to have any system in place for doing so… and failed to take any steps to remove appointees whose performance was

inadequate.'"); *In re Morgan Stanley ERISA Litig.*, 696 F Supp 2d 345, 366-67 (S.D.N.Y. 2009).

**5.2    The Plaintiffs have adequately alleged their claim for knowing breach of trust.**

The Defendants argue that the Plaintiffs' knowing breach of trust claim must fail because there are no supporting factual allegations, and that it cannot survive absent a viable claim for breach of a duty of prudence. To support their "no factual allegations" argument, the Defendants isolate a single line in the Complaint and read it as a whole. Defs.' Memo at 24, n. 14; *Braden*, 588 F.3d at 594. The Plaintiffs allege Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue. Compl. ¶¶ 1, 5-6, 13-20, 28, 42, 44. Defendants administered and controlled the Plan and appointed authorized representatives including the Committees, which had control over Plan management and the disposition of Plan assets. *Id.* The Defendants permitted imprudent investment options and unreasonable recordkeeping fees, which were unjustifiable considering the size and characteristics of the Plan. *Id.* Given the roles and relationships of the Defendants, the "natural inference is that the…defendants all knew – or at the very least should have known – about the alleged mismanagement." *Omnicom*, 2021 WL 3292487, at *17. Just as in *Omnicom*, because the Defendants knew – or at the very least should have known – about the alleged mismanagement of the Plan by the Board and Committees, the Plaintiffs have sufficiently stated a claim for a knowing breach of trust.

Moreover, because the Plaintiffs stated viable claims for breaches of fiduciary duty, they have adequately alleged their claim for knowing breach of trust. *Northwell Health*, 2022 WL 4639673, at *12.

22

6.     **The Board and Committees are fiduciaries under ERISA.**

The Defendants cite distinguishable caselaw to argue the Swiss Re's Board of Directors and the Committee Defendants are not fiduciaries under ERISA. For example, they cite *David v. Alphin*, in which the court excluded the defendant committees from the definition of a person in accordance with North Carolina law. 2008 WL 5244483, at *9 (W.D.N.C. July 22, 2008). North Carolina law does not govern this matter; the Defendants reliance on it is therefore misplaced.

This Court has already held that boards of directors and committees fall within ERISA's broad definition of a "person." *In re Beacon Assoc. Litig.*, 818 F. Supp. 2d 697, 705-706 (S.D.N.Y. Sept. 26, 2011). Because the Board and Committees exercise discretion and control over the Plan, Compl. ¶¶ 5, 13-20, they are liable as fiduciaries under ERISA. *In re Citigroup ERISA Litigation*, 104 F.Supp.3d 599, 604-605 (S.D.N.Y. May 13, 2015); *In re Bear Stearns Companies,* 763 F.Supp.2d 423, 566 (S.D.N.Y. Jan. 19, 2011)(*quoting Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002)); *In re Bank of America Corp.*, 756 F. Supp. 2d 330, 345-346 (S.D.N.Y. Aug. 27, 2010); *In re Citigroup ERISA Litigation,* WL 2762708, at *24 (S.D.N.Y. Aug. 31, 2009); *Crowley ex rel. Corning, Inc, Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 229 (W.D.N.Y. Dec. 9, 2002).

7.     **The Court should grant the Plaintiffs leave to file an amended complaint if it finds any of their claims deficient.**

Should the Court find the Complaint deficient, the Plaintiffs respectfully request leave to amend it. Leave to amend a complaint should be freely given. Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872 (5th Cir. 2000)(*quoting Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. Am. Co.*, 195 F.3d 765, 770 (5th Cir.

1999))("Unless there is a "substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.")).

The Defendants cite *DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 556-57 (S.D.N.Y. 2018) and this Court's rules for the proposition that the Complaint should be dismissed with prejudice. Defs.' Memo at 4 n.2. However, the Court denied their request for a preliminary conference and therefore the Plaintiffs have not "already had an opportunity to replead after specific warnings as to [the Complaint's] deficiencies. *DigitAlb*, 284 F. Supp. at 556-667. Moreover, the Plaintiffs reserved their right to file an amended complaint. Docket No. 25.

Last, Defendants will not be prejudiced by the amendment because discovery has not yet begun.

**CONCLUSION**

For those reasons, the Plaintiffs respectfully request this Court to deny the Defendants' motion to dismiss or, alternatively, to grant Plaintiff leave to amend their Complaint.

Dated: January 13, 2023

Respectfully Submitted,
**Sedhom Law Group, PLLC**

By: _Rania V. Sedhom_

Rania V. Sedhom (RS5439)
Matthew J. Scott (5803945)
630 Fifth Avenue, Suite 2508
New York, NY 10111
212-664-1600 (tel.)
212-563-9280 (fax)
rsedhom@bespokelawfirm.com
mscott@bespokelawfirm.com
*Attorneys for Plaintiffs and the Proposed Class*